Argued March 2, affirmed April 19, petition for rehearing
denied June 27, 1972

# MACCA, *Respondent, v.* GENERAL TELEPHONE COMPANY OF THE NORTHWEST, INC., *Appellant.*

495 P2d 1193

*Stewart M. Whipple,* Portland, argued the cause for appellant. With him on the briefs were Alan H. Johansen and Seitz, Whipple & Johansen, Portland.

*Anthony Pizzuti,* Portland, argued the cause for respondent. With him on the brief were Pizzuti and Mautz, Portland.

Before McAllister, Presiding Justice, and Denecke, Holman, Howell and Bryson, Justices.

HOWELL, J.

The defendant telephone company in its Beaverton, Oregon, directory listed an erroneous "after hours" telephone number for a floral shop in an advertisement in the yellow pages. The number listed actually belonged to plaintiff and her husband, who were self-employed tailors. The plaintiff filed an action seeking damages for emotional distress resulting from answering telephone calls "at all hours of the night." A jury returned a verdict for plaintiff for $1,000 and defendant appeals from the judgment.

The defendant urges several assignments of error based on the court's overruling a demurrer, refusal to grant a directed verdict, and in giving certain instructions to the jury. The defendant agrees, however, that the several assignments of error present the same issue: whether a plaintiff can recover for mental distress in the absence of physical injury.

The facts are not generally disputed.

The plaintiff lives in Portland and is a subscriber of the Pacific Northwest Bell Telephone Com-

pany. Andrew's Flowers, the floral shop, is located in Beaverton and is a subscriber of the defendant, General Telephone Company. In the yellow pages of both the Portland and Beaverton directories for 1970, the advertisement for Andrew's Flowers listed an "after hours" number for the florist as "775-6095" which was the telephone number of plaintiff's residence.

Shortly after the first of January, 1970, when the directories were published, the plaintiff, who was of Italian extraction and spoke broken English, started to receive telephone calls in the evening after she returned home from the tailor shop. What happened thereafter is most aptly described by Mrs. Macca:

"Q Well, can you perhaps tell us what started happening around January of 1970?

"A One night—we work all day. We work six days a week. Now, three months ago, we started five days a week because I can't work too much because I am too nervous now. And when we go home by 6:00, 10 past 6:00, I start to make dinner, sit down for start to eat, I called to the phone. Okay, I answer it. I say who? I don't understand very much by phone when the talk came. Face to face I understand better, but by phone I don't understand very much. Somebody said I like to order flowers, oh, you have a wrong number. I close her up. Start to eat. Just one night I left my dinner seven times."

In regard to calls later at night, she testified:

"Q Okay. How late would you get these calls, until what time at night?

"A I remember one time I was asleep we go— we go to sleep 11:00 o'clock, sometimes at 10:00, sometimes 10 after, sometimes 10 before. I started to sleep, ringing the phone, what happened, because I have a—just one son. He is married. When they ring the phone I think my son maybe something happens, maybe some trouble. I don't know. I was

excited because I have the phone on my nightstand on my side. I take the phone, somebody say I like order a bouquet of flowers. I said lots of words and closed the phone. This is no good. All night I can't sleep all night because I become too nervous. I have the pills in my purse for the nervousness. But at the time, just a minute, next day I came to work because all day I was just like drunk. That is all."

Mrs. Macca also testified that they received more than three telephone calls every night and on Saturdays and Sundays. The late calls interfered with her sleep and affected her work the next day. She contacted her son, Joseph Macca, to see if he could assist in solving the problem. The son testified that in January, after calling Pacific Northwest Bell in Portland, he contacted the defendant, General Telephone, and was advised that "something would be done about it." The calls continued, so Joseph called the defendant again about two months later and defendant stated that "the only way to solve the problem" would be for the Maccas to change their number as the florist number was a "business number" and could not be changed. The plaintiff was not interested in changing her number.

In late April Mrs. Macca went to the hospital for surgery and, not wanting to be disturbed by calls when she returned home, she contacted her attorney, who in turn contacted the defendant. In May the number was placed on "intercept," a system by which an operator checks all calls to determine if the caller is seeking plaintiff or the florist.

The sales manager for the General Telephone Directory Company testified that he was first advised of the problem in February after a call from the florist to the defendant. On February 25 he called Mr.

Macca. They could not understand one another, so he talked to Mrs. Macca and told her that the only way the calls could be eliminated was for the Maccas to change their number or "to challenge it through the Pacific Northwest Company." He stated that Mrs. Macca refused to agree to change her number or put it on intercept. He also stated that there was no way General Telephone could put the number on intercept without the consent of Pacific Northwest Bell. He admitted, however, it was the practice of the telephone companies to "work together on these matters." In early May the number was placed on intercept, apparently by Pacific Northwest Bell and with the consent of the plaintiffs.

In her complaint the plaintiff alleged that defendant was negligent in failing to list properly the florist's "after hours" number, to inspect the directory for errors, and to remedy the situation after knowledge of the error.

During the trial considerable colloquy was exchanged between court and counsel as to the theory of plaintiff's cause of action. It was not clear to the parties and the court whether the facts fell within the theory of outrageous conduct, invasion of privacy, or damages suffered from mental anguish or disturbance without physical injury.

■ We conclude that the erroneous listing of plaintiff's telephone number and the numerous telephone calls to plaintiff resulted in an invasion of plaintiff's right to enjoy her property without unreasonable interference. As such it is governed by the law relating to a private nuisance, and plaintiff is entitled to recover for mental distress resulting from defendant's negligent act.

■ Nuisance is a field of tort liability rather than a type of tortious conduct, and negligence is only one type of conduct that may give rise to a nuisance. Prosser, Law of Torts (4th ed) 573, 574, § 87. Liability may arise from an intentional act, a reckless act, or the operation of an abnormally dangerous activity as well as a negligent act. *Raymond v. Southern Pacific Co.*, 259 Or 629, 488 P2d 460 (1971). The gist of the action is the invasion of the individual's interest in the use and enjoyment of land. *Raymond v. Southern Pacific Co.*, supra at 634. It includes the disturbance of the comfort or convenience of the occupant of the land. Prosser, supra 592, § 89; *York et ux v. Stallings et al*, 217 Or 13, 21, 341 P2d 529 (1959). Dean Prosser gives as examples of the latter unpleasant odors, smoke or dust, loud noises, and repeated telephone calls.

A case quite similar to the one at bar is *Brillhardt v. Ben Tipp, Inc.*, 48 Wn 2d 722, 297 P2d 232 (1956). There, the defendant printed several thousand sales slips upon which the phone number of plaintiff, a realtor, was printed by mistake. As a result the plaintiff received as many as 20 telephone calls per day for several months. Plaintiff complained to defendant regarding the annoyance and inconvenience, but refused a request by the telephone company to change her number. Plaintiff was awarded $1,000 damages for the inconvenience and annoyance. Upon appeal the defendant argued that plaintiff was not entitled, under prior decisions of the Washington Supreme Court, to damages for mental suffering absent physical injury or pecuniary loss. The Supreme Court rejected defendant's argument on the basis that the erroneous sales slips containing plaintiff's telephone number and the annoyance to plaintiff

constituted a nuisance resulting in an actual invasion of plaintiff's right to enjoy her property without unreasonable interference. See also *Roland v. Slesinger,* 16 Misc 2d 1087, 185 NYS2d 303 (1959).

The holding by the Washington Court is in harmony with the weight of authority which allows, as a separate and distinct element of damages, recovery for the personal inconvenience, annoyance and discomfort to the occupant of the premises caused by the nuisance. Annot., 142 ALR 1307, 1316 (1943).[1]

It is true in the instant case that plaintiff may have been more upset and disturbed by the calls because of her unfamiliarity with American ways and lack of understanding of the language. It is also true that in such cases where the result of the interference is personal discomfort or annoyance, the standard is not the personal tastes or susceptibilities of the particular plaintiff. The nuisance must affect the "ordinary comfort of human existence as understood by the American people in their present state of enlightenment." Prosser, supra at 578.

---

[1] Allowing recovery for mental suffering and anguish unaccompanied by physical injuries under the circumstances of the present case is in accord with previous decisions of this court. Where an independent basis of liability exists, irrespective of whether there existed physical injuries, recovery has been uniformly allowed for mental suffering and anguish. Douglas v. Humble Oil, 251 Or 310, 445 P2d 590 (1968) (conversion); Tollefson v. Price, 247 Or 398, 430 P2d 990, 33 ALR3d 149 (1967) and Hinish v. Meier & Frank Co., 166 Or 482, 113 P2d 438, 138 ALR 1 (1941) (invasion of privacy); Williams v. Joyce, 91 Adv Sh 1481, 4 Or App 482, 479 P2d 513 (1971) (racial discrimination); Hovis v. City of Burns, 243 Or 607, 415 P2d 29 (1966) (wrongful disinterment of remains of plaintiff's husband); Rockhill v. Pollard, 259 Or 54, 485 P2d 28 (1971) ("outrageous" conduct by physician in treating a patient, citing 1 Restatement of Torts 2d, § 46, comment j.) For a general discussion and criticism of the rule prohibiting recovery for mental distress without a physical injury or pecuniary loss, see Prosser, Law of Torts (4th ed) 327-330, § 54.

However, we cannot say that calls late at night and from three to seven calls at the dinner hour for several months would not distress a person of ordinary habits and sensibilities. Additionally, we know of no reason why plaintiff, who operated a tailoring shop and who could presumably receive calls at home, should give up her telephone number in favor of a floral shop. Also, as the trial court found, Mrs. Macca undoubtedly did not understand what the defendant meant when she was advised the number could be put on intercept. Moreover, the offer to place the number on intercept was qualified to the extent that it would have to be with the permission of another phone company, Pacific Northwest Bell.

Finding no error, the judgment is affirmed.