Argued July 8, 1974, affirmed January 30, 1975

# NAGEL, *Appellant, v.* LANDELS ET UX, *Respondents.*

530 P2d 1239

*Richard Haeder,* Portland, argued the cause and filed a brief for appellant.

*Ridgway K. Foley, Jr.,* Portland, argued the cause for respondents. With him on the brief were Gino G. Pieretti, Jr., and Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland.

Before O'CONNELL, Chief Justice, and McALLISTER, DENECKE, HOLMAN, HOWELL, and BRYSON, Justices.

BRYSON, J.

Plaintiff brought this action to recover for injuries sustained when she fell on the back stairway of property owned by defendants but rented to tenants, Littlefields. The trial court granted defendants' motion for judgment of involuntary nonsuit at the close of plaintiff's case. Plaintiff appeals.

Plaintiff assigns as error the trial court's granting judgment of involuntary nonsuit, contending that

"[u]nder the evidence, the jury could find that the condition of the back steps of defendants' rental house, when let, was

"(1)   a nuisance; or

"(2)   ruinous; or

"(3)   dangerous; or

"(4)   unreasonably dangerous; or

"(5)   in violation of Portland ordinances."

We view the evidence in a light most favorable to the plaintiff. The facts leading up to plaintiff's fall are as follows. Defendants rented the premises involved to Mr. and Mrs. Littlefield some two and one-half years prior to the time of plaintiff's fall. The back of plaintiff's house abutted the back of the Littlefield residence. Plaintiff and the Littlefields had been neighbors over two years. In the early afternoon of Saturday, December 7, 1968, Mr. and Mrs. Littlefield visited in the home of Mr. and Mrs. Nagel. There is evidence that the parties drank intoxicating liquor at both the Nagel and Littlefield homes just prior to the accident, but there is no evidence that plaintiff was intoxicated. The Nagel automobile was being repaired at a garage. Mr. Nagel and Mr. and Mrs. Littlefield had returned to the Littlefield house and Mr. Nagel was going to pick up the car. Plaintiff did not want her husband to go after their car as he was "under the influence" and "did not have a driver's license." Plaintiff entered the Littlefields' house via the back steps to "call the garage to get the car before my husband could." She fell when going down the

back steps to return to her home. On direct examination she testified as follows:

"Q Is it fair to say you were in a hurry to get over to the Littlefields' house?

"A Yes.

"Q And when you called the garage were they getting ready to close?

"A Yes."

Plaintiff entered the house via the back steps so her husband could not see her. She testified:

"Q Had anyone ever warned you—anyone at all—had anyone at all ever warned you about the condition of that step, slanting the way it did?

"A They did not have to; I could see."

She also testified that she had not used the back steps before but she "had seen them and had seen the slant." Plaintiff gave several versions as to how she fell. She testified:

"Q You started to leave by the back door, tell me what happened.

"A I stepped down off the platform, and it just seemed like there was nothing there. It all just gave way.

"Q Why did you fall?

"A Because of the slanting step.

"* * * * * *

"Q * * * Would you tell us where you were looking as you started down the stairs?

"A As I started down I was just going to step down on this first step, and that's when I took my tumble."

At the time of plaintiff's deposition, on January 6, 1971, she testified as follows:

"'Question. Tell me what happened. How did it happen?

" 'Answer: I came out that back door and stepped down about the third step and it just gave way.

" 'Question: You mean it broke?

" 'Answer: Yes, I fell.

" 'Question: well, you say it just gave away. Now, what do you mean by that?

" 'Answer: There just wasn't nothing there to stand on.

" 'Question: Had you gone in that same way when you went in the house?

" 'Answer: Yes.

" 'Question: Were the steps all intact at that time or not?

" 'Answer: Yes.

" 'Question: But when you came out there wasn't anything there on one of the steps?

" 'Answer: It just seemed to give away when I stepped down on it.

" 'Question: Which step was it, counting from the top?

" 'Answer: The third or fourth.

" 'Question: Along in the middle of the stairway?

" 'Answer: Yes.

"Do you recall giving those answers to those questions in January of 1971 in your attorney's office in the deposition?

"A Yes."

Mrs. Littlefield was at her back door and observed the plaintiff's fall. She testified:

"Q Tell us what happened when she stepped off the landing.

"A She went to step on the first step and she lost her balance and went to the left, and then down

to the right, and then back to the left again, and fell."

On cross-examination Mrs. Littlefield testified:

"Q   Did you also testify that you saw her as she stepped on to the first step and saw her lose her balance?

"* * * * *.

"Q   Kind of balanced and then fell; is that correct?

"A   Yes.

"* * * * *.

"Q   Do you remember when we took your deposition in April of 1971?

"A   Yes.

"Q   Do you remember being asked these questions and giving these answers?

"Question:   Did you see her fall?

"Answer:   Yes.

"Question:   Where were you at that time?

"Answer:   Well, I was in the doorway, and she was on the porch.

"Question:   How did she fall?

"Answer:   She stepped off the step, and she just went forward. I mean, she kinda went headlong down into the steps and sprawled in the mud below"

Plaintiff's fall occurred at 3 p.m. The steps were covered and were dry. Several pictures of the back porch and steps were received in evidence.

During lengthy arguments and meticulous consideration by the court regarding defendants' motion for judgment of involuntary nonsuit, the following

colloquy occurred between the court and plaintiff's counsel:

"THE COURT: * * * Your client does not contend she slipped. She has not said one word in her testimony about having slipped. Your whole case, in so far as her testimony, is grounded on the fact the steps were slanted.* * * . Tell me one word where she says she slipped.

"[Counsel] She doesn't, Judge. * * * I'm not contending for a moment that she slipped on the stairs.

"* * * * * .

"THE COURT: * * * There isn't any claim that the step broke at all in this case. There isn't any delapidated or ruinous condition. The only thing that happened was that there was a slight slant—claim there was a slant, which was borne out by the evidence, but that is exactly what I'm getting at. That doesn't mean delapidated or ruinous condition.

"* * * * * .

"THE COURT: * * * What is the cause of your plaintiff's fall in this case? * * *.

"[Counsel] It was the slant."

The primary issue on this appeal involves the duty of the lessors, defendants, to plaintiff, who was lawfully on the premises and using the rear steps with the consent of the lessees. Restatement (Second) of Torts, § 356 (1965) states:

"* * * [A] lessor of land is not liable to his lessee or to others on the land for physical harm caused by any dangerous condition, whether natural or artificial, which existed when the lessee took possession."

Section 357, "Where lessor contracts to repair," and

Section 358, "Undisclosed dangerous conditions known to lessor," are exceptions to Section 356.

In *Jensen v. Meyers*, 250 Or 360, 441 P2d 604 (1968), the plaintiff visited the lessee of the defendant. The defendant, lessor, had left an old printing press in the garage which he was going to remove. The lessee knew the press was there; plaintiff was injured while playing with the press. In *Jensen* we rejected the comment to Section 356 of Restatement (Second) of Torts which explains the lessor's non-liability on the ground that when land is leased the law of property regards the lease as equivalent to a sale of land for the term of the lease and that the lessor stands in the same position as the grantor of property who is not liable for injuries occurring after title is transferred. We stated:

> "However, the immunity of the lessor may be rested upon grounds other than the mere transfer of a property interest to the lessee. Granting that one may, under certain circumstances, be liable for a condition attributable to his negligence which 'has passed beyond his control' as Harper & James point out, it does not follow that control is never a significant factor in allocating liability. * * *. But this is not to say that the lessor should be liable in every case where a dangerous condition exists at the time of leasing the premises. * * *
>
> "* * * * * *.
>
> "The mere fact that the hazard could have been eliminated by Meyers does not make him liable for plaintiff's injuries. The hazard could likewise have been eliminated by the McConnells [lessees]. The McConnells had the opportunity not only to render the machine harmless by covering it or immobilizing the moving parts, but they were also in a position to warn their guests of the danger and to exercise control of activities on the premises so as

to keep them away from the known danger. * * *"
250 Or at 363-65.

In the present case, the defendants knew that the rear steps were slanted when the dwelling was rented to the Littlefields. But there was also a bannister, or railing, on the lower side of the steps when defendants rented the property to the Littlefields. Mrs. Littlefield testified that the bannister came off ' and her husband "hung it up." There is no evidence that the defendants knew or had reasonable cause to suspect that the bannister on the steps came off or was removed by Mr. Littlefield. The removal of the bannister created part of the condition of the rear steps as they existed at the time of plaintiff's fall. If this condition of the steps presented a dangerous risk to plaintiff at the time she proceeded down the steps, the lack of a bannister was part of the condition that created the risk. In the absence of an agreement to the contrary, a lessor of premises is generally not responsible to persons on the land for conditions which develop or are created after possession has been transferred. Prosser, Torts 400, § 63 (4th ed 1971). Here the lessor had parted with possession and control of the property. Under the circumstances, the defendants could reasonably expect that the lessees would repair the bannister, notify the defendants of the disrepair, or warn the plaintiff of the condition of the steps without a bannister. We are of the opinion that the lessors should not be liable under the facts of this case.

Plaintiff also contends the court erred because the defendants were "responsible for repairs." We have examined the testimony and rental agreement received in evidence and find there was no agreement or evi-

dence supporting this contention. *See Bickham v. Reynolds et ux,* 224 Or 194, 199, 355 P2d 756 (1960).

■ The plaintiff also seems to imply that there was absolute liability on the part of the defendants for maintaining the steps of the premises in violation of certain city of Portland ordinances dealing with substandard buildings and dangerous or decayed buildings. From our review of the pleadings and the evidence, we conclude, as did the trial court, that the house involved in this case was not a substandard, dangerous, or decayed building.

■ Plaintiff also contends there was error because "a jury could find that when defendants leased their rental house, the back steps constituted a nuisance." Plaintiff argues that there was both a public and a private nuisance existing on defendants' premises. In two recent cases we have had occasion to discuss nuisance in the field of tort liability. *Macca v. Gen. Telephone Co. of N. W.,* 262 Or 414, 419, 495 P2d 1193 (1972); and *Raymond v. Southern Pacific Co.,* 259 Or 629, 488 P2d 460 (1971). It is sufficient to say that in the case at bar the plaintiff neither pleaded nor offered evidence sufficient to constitute a private nuisance.

The judgment of the trial court is affirmed.