DAVIS, *Respondent,*
*v.*
BOSTICK, *Appellant.*
(No. 76-4529, SC 25106)
580 P2d 544

Kenneth A. Morrow, Eugene, argued the cause for appellant. With him on the brief was Morrow & McCrea, P.C., Eugene.

William Wiswall, Springfield, argued the cause for respondent. On the brief were Sue A. Beto, and Lively & Wiswall, Springfield.

Before Holman, Presiding Justice, Howell and Lent, Justices, and Joseph, Justice Pro Tempore.

JOSEPH, Justice Pro Tempore.

**JOSEPH, J.,** Pro Tempore.

Plaintiff brought this action against her former husband, alleging that he had "engaged in an intentional course of conduct designed to inflict emotional stress and mental anguish." The conduct complained of consisted of 10 incidents, some of which were individual acts and some of which were groups of substantially identical acts committed at different times. The jury returned a verdict for $7,500 general damages and $10,000 punitive damages. Defendant appeals from the judgment.

The parties separated in May, 1973, after a nine-year marriage. The first of the incidents occurred shortly afterwards as they were returning to Eugene from an outing in Portland with their children when defendant struck plaintiff and broke her nose. Later in that year (in addition to initiating a series of threatening and abusive phone calls of varying frequency to her home and place of business which continued through 1975) he choked her and threatened to kill her and her male friends. During 1974, he accused her of being in the hospital for an abortion and told others the same thing, again threatened to kill her and destroyed some of her personal property. During 1975 he destroyed some more of her personal property, acted toward her in a threatening manner with a loaded pistol, damaged her boyfriend's pickup, told plaintiff and others she had a fatal mental illness, called her mother-in-law-to-be obscene names, harassed her mother and once more threatened to kill her.[1]

Defendant acknowledges there was evidence to support conclusions that defendant did each and every one of those things, and they encompass all of the acts alleged to have constituted the course of conduct. Indeed, there was also considerable evidence that around, between, during, in preparation for and as

[1] In 1975 he also wrote a letter to her fiance's employer to try to prevent his being hired as a policeman. Although defendant admitted that act, its consideration was withdrawn from the jury by the court.

constituent parts of the specific or collective acts recited defendant behaved in a manner that was, to put it mildly, outrageous in the extreme. There was substantial evidence that individually and as a whole the defendant's actions caused plaintiff to suffer emotional (as well as physical and economic) injury.

The parties were divorced in December, 1974, or January, 1975. Defendant remarried in April, 1975, and plaintiff remarried in November. This action was filed in August, 1976, more than two years after the acts which occurred in 1973 and more than two years after at least two of the acts which occurred in 1974.

Two assignments of error relate to acts which occurred in 1973 and 1974. The first is a claim that the court should not have submitted to the jury any of the acts that took place during the parties' marriage. Acknowledging that *Apitz v. Dames,* 205 Or 242, 287 P2d 585 (1955), abolished the rule of interspousal immunity in cases of intentional tort, defendant argues that where no physical injury is alleged[2] there ought to be immunity. The argued basis for that assertion is that otherwise a great many dissolutions of marriage will carry in their train an action like this one. An implication of that rationale is that the law ought to treat the dissolution of a marriage as a new beginning for both parties, with the aggressor free to go his (or her) way with at worst possibly a burden of guilt and the victim free to go her (or his) way with the burden of the emotional and mental scars.

■■ We decline to carve out that exception to the destruction of interspousal immunity for intentional torts. *Apitz* did not create a flood of litigation, even though it is a fair guess that the deterioration of many marriages since 1955 has been accompanied by the rendering by one spouse to another of physical injury. While injuries of a psychic nature as proved here are

---

[2]The evidence indicated that plaintiff did in fact suffer some physical injuries of a temporary nature and economic damage, but the complaint alleged only "emotional stress and mental anguish."

very likely much more common than physical injury, we see no virtue in basing a rule of law on a speculative fear of increased litigation. We prefer to rely upon the burden of proof as the best protection against unwarranted, meretricious or merely vindictive litigation. As we said in *Rockhill v. Pollard,* 259 Or 54, 60, 63, 485 P2d 28 (1971), "the conduct must be outrageous in the extreme and it must have produced severe emotional distress." Where a jury could reach those conclusions, as it fairly could and did here, the conduct ought to be actionable and not protected by an assumption that too much justice might be demanded by injured persons. As Dean Prosser has said (Law of Torts (4th ed), § 12, p 51):

> "It is the business of the law to remedy wrongs that deserve it, even at the expense of a 'flood of litigation,' and it is a pitiful confession of incompetence on the part of any court of justice to deny relief on such grounds."

The second assignment arising out of the inclusion of the 1973 and pre-August, 1974, acts in the complaint is much worthier. Defendant pleaded the two-year statute of limitations in ORS 12.110(1) as to some of the conduct alleged, but at the close of the case, on plaintiff's motion, the trial court struck the defense on the ground that a continuous tort was alleged. The jury was instructed to ignore the statute of limitations defense and that it could award plaintiff damages for "any emotional distress and anxiety which she has suffered." Exception was taken to both instructions.

No assignment of error is directed at the damage instruction, and defendant's specific assignment raises only the court's striking the statute of limitations defense. He points out that the damage instruction by its express terms allowed the jury to award damages for the alleged course of conduct had it found that only the acts in 1973 or early 1974 had in fact produced emotional distress or mental anguish. Arguably at least, the instruction was erroneous in that respect, for at the heart of the continuing tort idea is the concept that recovery is for the cumulative effect of wrongful

behavior, not for discrete elements of that conduct. *See Landman v. Royster*, 354 F Supp 1302, 1315 (ED Va 1973).

■ As particularized error, the giving of the instruction is not before us, but it serves to illuminate the problem. The plaintiff, or witnesses on her behalf, testified that each of the incidents caused her severe distress and anguish at the time. The only testimony that might be said to have gone to a cumulative effect was that she always felt harassed by the defendant's conduct and she is now a nervous person. On the facts proven there can be no doubt that defendant's abusive behavior was all of a piece in intent and content without substantial letup for three years and with almost diabolical variety. But there also can be no doubt that the acts of assault and battery and the death threat in 1973 and the defamatory abortion talk and death threat in early 1974 were separately actionable because they caused harm.

Plaintiff's assertion that no cause of action accrued for those incidents cannot be accepted. The situation was not one like the undiscovered malpractice in *Shives v. Chamberlain,* 168 Or 676, 126 P2d 28 (1942), and *Hotelling v. Walther,* 169 Or 559, 130 P2d 944 (1942), or the continuous condition producing an unitary trespass and cumulative injury in the fluoride cases such as *Reynolds Metals Company v. Yturbide,* 258 F2d 321 (9th Cir 1958). Neither counsel has found a case squarely raising the point here. We have not found precise authority either. *Polin v. Dun & Bradstreet, Inc.,* 511 F2d 875 (10th Cir 1975), is cited by plaintiff, but it is a more limited case. It concluded that the harm complained of (invasion of privacy) might have reached the level of actionability only at the end of the series of publications, the first of which was beyond the statute of limitations. As we have said, this defendant's conduct repeatedly reached the level of actionability.

It is true that the statute of limitations might well not begin to run on this sort of cause of action "until the defendant's conduct has culminated into the plaintiff's severe emotional distress." The trouble is that a broken nose, believable death threats, and a false accusation and rumormongering about an abortion not only ought to have produced some severe contemporaneous distress, but plaintiff proved they did.

The closest analogy seems to be trespass and nuisance cases. However, situations of continuing trespass arise out of the permanence, usually physical, of the trespassory thing and nuisance arises by definition[3] when the conduct constituting the unreasonable invasion of the complainant's use and enjoyment of land begins. In either type of case it is clear that the statute of limitations begins to run when the trespass or interference originates, because *the* cause of action has accrued. *See* Dobbs, Remedies (1973), § 5.4, p 343. The "question of considerable difficulty" in those cases is whether successive actions are allowed or whether one action must suffice for past, present and future damages. *See* Prosser, *supra,* § 13 at 74-75.

So the analogy is not necessarily helpful, for a separate cause of action certainly could have been asserted after each of defendant's nefarious acts in 1973 and 1974. The acts were discontinuous in the sense that each had a beginning and an end, each was separated from the next by some period of relative quiescence, and each was capable of producing compensable harm.[4] They were continuous in that together they in fact made up a course of conduct capable of producing cumulative compensable harm, and they collectively had a common element of intent.

---

[3] Assuming there is such a definition. *See* W. Prosser, Law of Torts, (4th ed 1971), §§ 86-87; and *Macca v. Gen. Telephone Co. of N.W.,* 262 Or 414, 419, 495 P2d 1193 (1972).

[4] We note that many of the incidents, but not all of them, during the three years were stimulated by confrontations created by court appearances, court orders or child visitations (or denials).

We can well imagine a case where the conduct has an identifiable total effect which is *a* product of the course of conduct, such as the suicide brought about by threats and accusations in *Tate v. Canonica,* 180 Cal App 2d 898, 5 Cal Rptr 28 (1960). On the evidence this is not such a case. Plaintiff's theory is that she ought to recover now for a series of wrongs, but her evidence is that she was harmed by each act in the series. We do not think she was entitled to ride out the storm and lump sum her grievances. *Cf., Fowkes v. Pennsylvania Railroad Company,* 264 F2d 397, 399 (3rd Cir 1959). Were she to be permitted to do that, we cannot see where the relation back would end in this sort of case.

■ The policy of the statute of limitations is to put at legal rest old claims. Designating a series of discrete acts, even if connected in design or intent, a "continuing tort" ought not to be a rationale by which the statute of limitations policy can be avoided, for surely the cause of action "accrued" at some time (*see U.S. Nat'l Bank v. Davies,* 274 Or 663, 548 P2d 966 (1976); *Berry v. Branner,* 245 Or 307, 421 P2d 996 (1966)); or, to put it another way, a cause of action does not reaccrue every time another distress is inflicted. It might be said that the cause of action accrued when the acts became continuous, and that question could be left to the jury. The defect in that is that all of the evidence, however remote in time, would still come in; the jury would be instructed to disregard anything which happened prior to the magic continuity date. That is not very realistic.

■ This defendant is not deserving of any special sympathy or consideration. Nonetheless, during the whole series of aggravated acts he was within reach of process by the injured person. The one restraint he might have heeled to was the institution of a lawsuit. The plaintiff instead chose to bear her burden without that legal recourse for three years and two months. Separately considered, the 1973 and early 1974 acts were then beyond legal reach. We hold that she was

not entitled to revive their actionability by designating them merely as elements of a single tort. The trial court erred in striking the statute of limitations defense.

■  One other assignment of error remains to be considered because it involves an issue that may arise on the retrial. Twice the defendant attempted to introduce into evidence a transcript of remarks made by the judge at the conclusion of one of the parties' court appearances relating to child visitation rights. The relevance of the evidence was claimed to be that it would show that the defendant's conduct "was motivated to some extent and caused to some extent by what Judge Leavy said in that transcript." The court properly ruled that what was said in connection with another proceeding was irrelevant to any issue in this one. Defendant also argues that the evidence should have been admitted in mitigation of the claim for punitive damages. Defendant in his own testimony made no claim that his conduct was affected in any manner by Judge Leavy's remarks. Even if he had done so, we cannot see that a transcript of those remarks had any relevance. The evidence was properly rejected.

The judgment of the trial court is reversed and remanded for a new trial.