No. 82-246

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

JOHN B. FRENCH and RUTH FRENCH,

Plaintiff and Respondent,

vs.

RALPH E. MOORE, INC., d/b/a
INTERSTATE TEXACO SERVICE STATION,

Defendant and Appellant.

Appeal from: District Court of the Sixth Judicial District,
In and for the County of Park
Honorable Jack D. Shanstrom, Judge presiding.

Counsel of Record:

For Appellant:

Berg, Coil, Stokes & Tollefsen, Bozeman, Montana
Gig A. Tollefsen argued, Bozeman, Montana

For Respondent:

Goetz, Madden & Dunn, Bozeman, Montana
James H. Goetz argued, Bozeman, Montana

Submitted: December 16, 1982

Decided: April 7, 1983

Filed: APR 7 - 1983

*Ethel M. Harrison*

Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

The defendant, Ralph E. Moore, Inc. d/b/a Interstate Texaco Service, appeals a judgment entered on a jury verdict in Park County District Court. The action was a suit for damages arising out of injury to real property caused by gasoline contamination or pollution of the plaintiffs' restaurant and family home. The suit was based on nuisance, trespass, and negligence theories. The jury awarded $58,500 to John and Ruth French for diminution of value of the property, for loss of use of the property, and for income lost through closure of the restaurant. The jury also awarded $40,000 to John French and $150,000 to Ruth French for pain, discomfort, fears, anxiety, annoyance, inconvenience and other mental, physical and emotional distress suffered by the plaintiffs as a result of the invading gasoline vapors. Interstate Texaco appeals only from the $40,000 and $150,000 awards. Interstate Texaco contends the jury was given an improper instruction and further that the jury verdict was excessive and rendered under the influence of passion or prejudice. We affirm.

On January 14, 1981, strong odors of gasoline were detected in the basement of a Livingston restaurant owned and operated by John and Ruth French. The family home is located on the same lot behind the restaurant and the Frenches live there with their two daughters. Livingston fire officials investigated the odor and immediately ordered the closure of the restaurant because of the danger posed by the strong concentration of gasoline fumes. The presence of gasoline fumes has continued at the restaurant and family residence

since January 14, 1981, and the restaurant has remained closed on order of the Livingston fire officials.

The contamination suit was based on trespass to real property, negligence, and nuisance. The Frenches sought damages for business losses such as loss of income caused by closure of the business, loss of use of the property caused by the gasoline fumes, and diminution of value of the property caused by the presence of gasoline fumes. In addition, they sought damages for pain, discomfort, fears, anxiety, annoyance, inconvenience and other mental, physical and emotional distress suffered as a result of the invading gasoline fumes. Before trial Interstate Texaco moved to strike this last claim for damages on the ground it was not permitted by Montana law. The motion was denied. The claim is asserted again in this appeal.

Gasoline fumes, at various levels of concentration, were present in the restaurant and home during 1981 and 1982 to the time of trial. From the time of the restaurant closure on January 14, 1981 to the time of trial in March 1982, the restaurant and home were tested for gasoline fume concentration. Livingston fire officials used a device called a Bacharach Sniffer (sniffer)--which detects gasoline hydrocarbons in the atmosphere in parts per million (ppm). The readings commonly established a hydrocarbon presence at levels dangerous to human health.

Dr. Samuel Rogers, a biochemist at Montana State University, testified that the sniffer readings at the French property indicated a clear "human health hazard." Based on learned treatises in the field, he testified that it is not safe, from a physiological standpoint, to enter a room for even a brief period of time which has gasoline concentrations

3

of 2,000 ppm. He also testified that benzene, a constituent of gasoline, is a known carcinogen (cancer-causing agent) and a leukemogen (an agent that causes leukemia). He characterized benzene as genetically toxic.

The fire department readings during 1981 and 1982 indicated health-endangering concentrations of hydrocarbons. On January 14, 1981, when the restaurant was closed, the sniffer readings in the French home were 15-20 ppm, considerably above the safety standards set by the Federal Occupational Safety and Health Administration. On the same day, however, the sniffer readings in the basement of the restaurant had readings ranging from 8,000 to 9,000 ppm and 900 ppm at the top of the basement stairs of the restaurant. The sniffer readings in 1982 were comparable to those in 1981, and those readings ranged at times from 0 to 9,600 ppm. The levels of gasoline hydrocarbons routinely exceeded 2,000 ppm on the French property.

From the first time he took sniffer readings in the basement of the French home, and at various intervals thereafter, Fire Marshall Warren Case, told the Frenches that it was not a good idea to stay in the home because of the health and safety hazards. Fire Marshall Case also testified that while conducting the sniffer readings he got lightheaded and dizzy. The gasoline smell stayed on his clothes after he left the building and, after he had left the building other people had remarked about the smell of gasoline on his clothes. The Livingston Fire Chief, Bob Hampson, testified that after leaving the French premises and returning to the fire station about 14 or 15 blocks away, he could still taste the gas.

4

The closure of the restaurant caused other problems for the Frenches. Although the restaurant was not their only source of income, the uncontradicted testimony is that they did not have the finances to move from the family home to another place. The Frenches had also invested a good portion of their life savings in the home and business, and because of the gasoline vapors, they stood to lose both. At the time of the restaurant closure, a loan of $105,000 was still owed to financial institutions. Before the restaurant closure, John French always made his payments on a regular basis. However, they could not make the February, March and April 1981 payments and finally the Frenches obtained a suspension of the monthly payments owed until the closure problem was resolved. Nonetheless, interest on this $105,000 loan continued to accrue at the rate of over $55 per day. The business problems alone caused the Frenches a great deal of stress and mental anguish.

The uncontradicted testimony of the Frenches established that despite the warnings from the fire department officials not to stay in the house because of the high hydrocarbon readings, they could not afford to move anywhere else and that no one had offered to help them move pending a resolution of the gasoline fume problems.

The gasoline fumes caused physical, mental, and emotional problems for the Frenches. Although John French testified that the only symptoms he had were dizziness at times, which would be alleviated by simply getting out of the house, other members of the family were not so fortunate.

Ruth French testified that after the onset of the gasoline fumes, she developed a duodenal ulcer and that the continuing stress caused because of the gasoline fumes

5

problem caused her ulcer to flare up. The gasoline fumes affected her more than any member of the family. The fumes got into her sinuses, caused headaches, and she would in turn become nauseous. Often she was forced to vomit. One of the Frenches' daughters complained of headaches and dizziness, and her eyes watered to such an extent that she was always putting a solution in them to alleviate the problem. The other daughter is mentally retarded, and although she had complained of no problems for most of the time, about one month before trial, she began complaining of headaches and dizziness.

The strong smell of gasoline, particularly in the basement, often prevented the family from using the basement, which includes a family room, a bathroom, a bedroom, and a laundry room. Fire department officials warned them not to use the clothes dryer for fear of causing an explosion. The Frenches were forced with solving a problem beyond their control. They took efforts, at the suggestion of the fire department, to eliminate the gasoline fumes from their home, but the problems continued.

The case was tried on theories that Interstate Texaco negligently installed the gas tanks at the service station and so caused the gasoline leaks leading to the contamination of the French property, that in permitting the gas to leak from its tanks, Interstate Texaco caused and permitted a nuisance to exist, and that the invading gasoline fumes constituted trespass to the French property. In instructing the jury on the measure of recovery, one instruction stated in part that the jury could award damages for ". . . pain, discomfort, fears, anxiety, annoyance, inconvenience, and other mental, physical, and emotional distress." With the

exception of the element of pain, Interstate Texaco objected to this instruction on the ground that the pleadings did not permit recovery for these factors of damage and that the evidence did not support recovery for these factors of damage. The objection was overruled.

After trial, Interstate Texaco moved for a new trial on the same ground. The motion was denied. Throughout the trial court and appellate proceedings, Interstate Texaco has ignored the fact that the case was submitted to the jury on the theories of nuisance and trespass as well as negligence. Based on its underlying and erroneous assumption that the case was tried only on a negligence theory, or that the jury returned its verdict based only on a negligence theory, Interstate Texaco complains now that the instruction setting forth the damages recoverable, was in error.

As we have stated, the underlying action here is a suit for damages arising out of injury to real property caused by gasoline contamination or pollution of the Frenches' restaurant building and the family home. The general measure of damages provided for in all non-contract situations, is provided for in section 27-1-317, MCA, which states:

> "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is <u>the amount which will compensate for all the detriment proximately caused thereby</u>, whether it could have been anticipated or not." (Emphasis added.)

Where there has been a trespass to land, damages for the discomfort and annoyance to the occupant, in addition to damages to the land or for loss of use of the land itself, have long been recognized. The rule for recovery is set out in the Restatement (Second) of Torts § 920:

> "(1)  If one is entitled to a judgment for harm to land resulting from a past invasion and not

7

amounting to a total destruction of value, the damages include compensation for

"(a)   the difference between the value of the land before the harm and the value after the harm, or at his election in an appropriate case, the cost of restoration that has been or may be reasonably incurred;

"(b)   the loss of use of the land; and

"(c)   discomfort and annoyance to him as an occupant."   Restatement (Second) of Torts § 920.

The Restatement further emphasizes that:

"Discomfort and annoyance to an occupant of the land and to the members of the household are distinct grounds of compensation for which in ordinary cases the person in possession is allowed to recover in addition to his proprietary interests."   Also see Prosser, Torts § 90, at 603 (4th ed. 1971).

These basic principles have long been applied in this state.   In Newton v. City of Roundup (1921), 60 Mont. 24, 198 P. 441, this Court recognized that an owner or occupant of real estate is entitled to recover damages for personal inconvenience, discomfort, annoyance or mental anguish, in addition to damages for depreciation in value of property or its use, due to a private nuisance.   And, in Nelson v. C. & C. Plywood (1970), 154 Mont. 414, 465 P.2d 314, plaintiffs filed an action for pollution of their water supply caused by the defendant's dumping of glue waste resulting in noxious waste, odor and color.   In addition to the damages recoverable for the cost of replacing or restoring the water supply, the jury was properly instructed that it could award damages for "discomfort, annoyance and inconvenience, if any . . . ."

Although we also note that Interstate Texaco has ignored the actual physical problems (i.e., physical injury) to the French family as a result of the invading gasoline fumes, the

8

argument that there must be actual physical injury in such situations has been rejected in other jurisdictions. In Kornoff v. Kingsburg Cotton Oil Co. (1955), 45 Cal.2d 265, 288 P.2d 507, an action was brought based on nuisance and trespass for damages sustained as the result of dust pollution emanating from the defendant's ginning mill. The court upheld the right to seek damages for injury to real property as well as for personal discomfort, annoyance, nervous distress and mental anguish. The court recognized the obvious that such damages would, or at least could, be proximately caused by a defendant's invasion of the property, even where there is no physical injury suffered.

The court further recognized that in California the

". . . cases appear to draw no distinction between cases involving nuisance and those involving trespass in permitting an award of damages for discomfort and annoyance directly resulting from an injury to real property. There seems to be no sound reason to refuse to award damages for discomfort and annoyance where the only injury is to the real property since it is obvious that such an injury may cause discomfort and annoyance without also causing an actual physical injury to the person." Kornoff, 288 P.2d at 513.

In Edwards v. Talent Irrigation District (Or. 1977), 570 P.2d 1169, the Oregon Supreme Court came to the same result. Plaintiffs filed an action in both trespass and negligence asserting damages sustained as the result of water overflow on their property caused by defendant's irrigation ditch, one of the claims being for mental anguish. In sustaining the trial court's refusal to strike the claim for mental anguish, the Court, based on Macca v. Gen. Telephone Co. of N.W., Inc. (1972), 262 Or. 414, 495 P.2d 1193, reaffirmed its ruling that damages for mental anguish are recoverable in a negligence action if they result from defendant's interference with the use and enjoyment of plaintiff's land.

9

Hon. Daniel J. Shea
Justice, Supreme Court
Room 414 Justice Building
215 North Sanders
Helena, Montana  59620

CORRECTION. In preparing this opinion for publication, we noted in our verification of titles and citations the matters listed below. Corrections have been made on our copy of the opinion.

Date:

Re:        May 4, 1983

           French v. Ralph E. Moore, Inc., No. 82-246, April 7, 1983


Page 10, line 7 --- Nevada Cement Co. v. Lamler should read Nevada
Cement Co. v. Lemler.

Page 10, line 10 --- 45 Wash.2d 345 should read 45 Wash.2d 346.

WEST PUBLISHING COMPANY
Box 3526
St. Paul, MN 55165

The Court further noted that this appears to be the general rule in states which have considered the question, citing Annot., 28 A.L.R.2d 1075, 1087 (1953).

In addition to the California and Oregon holdings, see: Miller v. Carnation Co. (Colo.App. 1977), 564 P.2d 127; Pollard v. Land West, Inc. (Idaho 1974), 96 Idaho 274, 526 P.2d 1110; Nevada Cement Co. v. Lamler (1973), 89 Nev. 447, 514 P.2d 1180; City of New Cordell v. Lowe (Okla. 1963), 389 P.2d 103; Riblet v. Spokane-Portland Cement Co. (1954), 45 Wash.2d 346, 274 P.2d 574.

We likewise hold that damages for mental anguish are recoverable in a negligence action where the claim is that the defendant has interfered with the use and enjoyment of plaintiff's land. No sound reason exists to hold otherwise.

Interstate Texaco next argues that the jury awards for "pain, discomfort, fears, anxiety, annoyance, inconvenience, and other mental, physical and emotional distress" constituted excessive damages because they were given under the influence of passion and prejudice. The jury awarded $40,000 to John French and $150,000 to Ruth French. After trial, Interstate Texaco moved for a new trial. Section 25-11-102(5), MCA, provides that a ground for a new trial exists if the jury awarded "excessive damages . . . under the influence of passion or prejudice." In denying this motion the trial court remarked that its conscience was undisturbed by the amount of the jury's verdict.

Interstate Texaco has pointed to no factors occurring at trial which indicate that the jury's verdict was influenced by passion or prejudice. No inflammatory evidence was presented and no other factors have been relied on. Rather, Interstate Texaco merely argues that the verdict is not

10

supported by the evidence. A precise measuring rod for the amount of damages in a case involving physical or mental damages, does not exist.

The measure of damages for all noncontract causes of action not otherwise specifically provided for by statute, is provided for in section 27-1-317, supra, which ". . . is the amount which will compensate for all the detriment proximately caused" by the defendant's act or omission "whether it could have been anticipated or not." See Rasmussen v. Sibert (1969), 153 Mont. 286, 456 P.2d 835. Each case must, of necessity, depend on its own peculiar facts.

In applying section 25-11-102(5), supra, this Court has long adhered to the rule that a jury award of damages will not be overturned unless it shocks the conscience of the court. Ashley v. Safeway Stores, Inc. (1935), 100 Mont. 312, 47 P.2d 53. In Ashley, we further stated that:

> ". . . It is not a question of the amount this Court would have awarded under the circumstances. It is not the amount which in our opinion would compensate the injured party; rather, it is a question of what amount of damages will the record in the case support when viewed, as it must be, in the light most favorable to the plaintiff . . ." 100 Mont. at 330, 47 P.2d at 62.

Although the amount which may be determined to be unconscionable has varied from time to time due to the makeup of this Court, nonetheless, the rules are still the same. See Pfau v. Stokke (1940), 110 Mont. 471, 103 P.2d 673, and Lauman v. Lee (1981), ____ Mont. ___, 626 P.2d 830, 38 St.Rep. 499.

Interstate Texaco presented no evidence on the damage questions involved in this appeal. And, although complaint is made of the $150,000 award to Ruth French, Interstate

11

Texaco made the choice not to cross-examine her. Her testimony therefore stands not only unrefuted but also unweakened by whatever inroads a cross-examination may have produced.

In asking this Court to invalidate the jury's verdict, Interstate Texaco presents three arguments. The first argument is that the amounts awarded to John French and Ruth French bear no reasonable relationship to the amounts awarded for the diminution of value of the real property, loss of use, and lost business profits. The second argument is that the amount awarded to Ruth French ($150,000) is more than three times that awarded to John French ($40,000) and therefore it must be set aside. Third, Interstate Texaco argues that the verdicts must be set aside as excessive because they are out of proportion to cases decided in this and other states where the same items of damages were involved.

Interstate Texaco does not attempt to explain why a jury verdict must be set aside because of an alleged disproportion in separate items of damage. The damages awarded for diminution of property value, loss of use, and loss of business income have no bearing on the physical and mental damages suffered by John and Ruth French. Nor do the damages awarded to John French have a bearing on the damages awarded to Ruth French. The uncontradicted evidence is that the gasoline vapors caused more serious mental and physical consequences to Ruth French than to John French, such as the duodenal ulcer and the recurring stress effects on the ulcer. In addition, Ruth French stayed in the family home most of the time while John French left the home every day to attend to another business. Under these circumstances it would be

12

more than anomalous if the jury did not award considerably more to Ruth French than to John French.

Finally, Interstate Texaco would have us set aside the jury's verdict on a basis of having compared the verdict with verdicts in other cases cited in Interstate Texaco's brief. These cases shed no light on the issue before this Court, which is whether the jury's verdict shocks our conscience. The cases were decided at different times, under different factual circumstances, and in different jurisdictions. An award of damages in one case is unique from an award of damages in another case, and we will not use the one as a measuring rod to determine whether damages in another case were excessive because influenced by passion or prejudice. We find nothing in the jury's verdict here to shock our conscience.

The judgment of the District Court is affirmed.

_____
                      Justice

We Concur:

_____
        Chief Justice

_____

_____

_____
            Justices

13