**Marie PEARSON, Plaintiff,**

v.

**REYNOLDS SCHOOL DISTRICT # 7, Ivan L. Leigh, and Jeff Gilbert, Defendants.**

**No. 3:12–CV–01146–HU.**

United States District Court, D. Oregon, Portland Division.

Signed Feb. 24, 2014.

William J. Macke, Law Offices of William J. Macke, Portland, OR, for Plaintiff.

Blake H. Fry, Barrett C. Mersereau, Peter R. Mersereau, Mersereau & Shannon, LLP, Portland, OR, for Defendants.

## ORDER

BROWN, District Judge.

Magistrate Judge Dennis James Hubel issued Findings and Recommendation (# 47) on November 18, 2013, in which he recommends the Court grant in part and deny in part Defendants' Motion (# 34) for Summary Judgment. Specifically, the Magistrate Judge recommends the Court:

(1) grant Defendants' Motion as to all claims against Defendants Ivan L. Leigh and Jeff Gilbert;

(2) grant Defendants' Motion as to Plaintiff's Title VII claim for disparate treatment;

(3) grant Defendants' Motion as to Plaintiff's Title VII claim for retaliation for filing a complaint with the Oregon Bureau of Labor and Industry (BOLI);

(4) grant Defendants' Motion as to Plaintiff's claim for intentional infliction of emotional distress;

(5) grant Defendants' Motion as to Plaintiff's claim for negligent supervision;

(6) grant Defendants' Motion as to Plaintiff's claim for punitive damages;

(7) deny Defendants' Motion as to Plaintiff's Title VII claim for retaliation claim as related to retaliation for Plaintiff's April 2010 internal discrimination complaint;

(8) deny Defendants' Motion as to Plaintiff's Title VII claim for hostile work environment; and

(9) dismiss Defendants Ivan L. Leigh and Jeff Gilbert from this matter as improper parties.

Defendants filed timely Objections to the Findings and Recommendation in which they object to the Magistrate Judge's recommendation to deny Defen-

dants' Motion for Summary Judgment as to Plaintiff's Title VII claim for hostile work environment and to deny in part Plaintiff's Title VII retaliation claim. Plaintiff filed untimely[1] Objections to the Findings and Recommendation in which Plaintiff objects to the Magistrate Judge's recommendation to grant Defendants' Motion as to Plaintiff's Title VII claim for retaliation for filing a complaint with BOLI. The matter is now before this Court pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b).

 When any party objects to any portion of the Magistrate Judge's Findings and Recommendation, the district court must make a *de novo* determination of that portion of the Magistrate Judge's report. 28 U.S.C. § 636(b)(1). *See also Dawson v. Marshall*, 561 F.3d 930, 932 (9th Cir.2009); *United States v. Reyna–Tapia*, 328 F.3d 1114, 1121 (9th Cir.2003) (*en banc* ).

In their Objections Defendants and Plaintiff reiterate the arguments contained in the Motion for Summary Judgment, Response to Motion for Summary Judgment, and Reply and stated at oral argument. This Court has carefully considered the Objections of Defendants and Plaintiff and concludes they do not provide a basis to modify the Findings and Recommendation. The Court also has reviewed the pertinent portions of the record de *novo* and does not find any error in the Magistrate Judge's Findings and Recommendation.

## CONCLUSION

The Court **ADOPTS** Magistrate Judge Hubel's Findings and Recommendation (# 47) and, therefore, **GRANTS in part** and **DENIES in part** Defendants' Motion (# 34) for Summary Judgment as follows:

(1) **GRANTS** Defendants' Motion as to all claims against Defendants Ivan L. Leigh and Jeff Gilbert;

(2) **GRANTS** Defendants' Motion as to Plaintiff's Title VII claim for disparate treatment;

(3) **GRANTS** Defendants' Motion as to Plaintiff's Title VII claim for retaliation for filing a complaint with the Oregon Bureau of Labor and Industry (BOLI);

(4) **GRANTS** Defendants' Motion as to Plaintiff's claim for intentional infliction of emotional distress;

(5) **GRANTS** Defendants' Motion as to Plaintiff's claim for negligent supervision;

(6) **GRANTS** Defendants' Motion as to Plaintiff's claim for punitive damages;

(7) **DENIES** Defendants' Motion as to Plaintiff's Title VII claim for retaliation claim as related to retaliation for Plaintiff's. April 2010 internal discrimination complaint;

(8) **DENIES** Defendants' Motion as to Plaintiff's Title VII claim for hostile work environment; and

(9) **DISMISSES** Defendants Ivan L. Leigh and Jeff Gilbert from this matter as improper parties.

Accordingly, this matter proceeds only against Defendant Reynolds School District # 7 as to Plaintiff's (1) Title VII retaliation claim related to alleged retaliation for her April 2010 internal discrimination complaint and (2) Title VII claim for hostile work environment.

IT IS SO ORDERED.

---

1. Although Plaintiff's Objections were untimely, the Court, in the exercise of its discretion, considers them in order to ensure all of the parties' arguments have been reviewed by the Court.

## FINDINGS & RECOMMENDATIONS ON MOTION FOR SUMMARY JUDGMENT

HUBEL, United States Magistrate Judge.

The plaintiff Marie Pearson brings this action "pursuant to Title VII of the Civil Rights Act of 1964," against her former employer Reynolds School District #7 ("Reynolds"), its principal Jeff Gilbert, and Pearson's supervisor Ivan L. Leigh. Dkt. #5, First Amended Complaint, ¶¶ 2 & 4. Pearson alleges the defendants "subjected her to discriminatory and retaliatory treatment based on her race and gender, while she was employed as lead night janitor" at Reynolds High School (the "School"). Dkt. #5, First Amended Complaint, ¶ 1. She asserts claims for race discrimination/retaliation, gender discrimination/retaliation, hostile work environment, negligent supervision, and intentional infliction of emotional distress. *Id.*, ¶¶ 29–38. Pearson seeks economic, noneconomic, and punitive damages; prejudgment interest; and attorney's fees and costs. *Id.*, ¶ 39.

The case is before the court on the defendants' Motion for Summary Judgment. Dkt. #34. The motion is fully briefed, and the court heard oral argument on the motion on September 10, 2013. The undersigned submits the following findings and recommended disposition of the case pursuant to 28 U.S.C. § 636(b)(1)(B).

## I. PROPER PARTIES DEFENDANT

■ As a preliminary matter, the parties agree the only proper defendant in the case is Reynolds. *See* Dkt. #35, Defendants' brief, pp. 14–15; Dkt. #41, Plaintiff's brief, pp. 8–9 ("plaintiff agrees the only remaining defendant is Reynolds School District"). Accordingly, summary judgment should be granted in favor of the individual defendants Ivan L. Leigh and Jeff Gilbert, on all of Pearson's claims. *Id.*

## II. GENERAL SUMMARY JUDGMENT STANDARDS

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). In considering a motion for summary judgment, the court "must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial." *Playboy Enters., Inc. v. Welles,* 279 F.3d 796, 800 (9th Cir. 2002) (citing *Abdul–Jabbar v. General Motors Corp.,* 85 F.3d 407, 410 (9th Cir.1996)).

The Ninth Circuit Court of Appeals has described "the shifting burden of proof governing motions for summary judgment" as follows:

> The moving party initially bears the burden of proving the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S.Ct. 2548. Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial. *Id.* at 324, 106 S.Ct. 2548. This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party must do more than show there is some "metaphysical doubt" as to the material facts at issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In fact, the non-

moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. In determining whether a jury could reasonably render a verdict in the non-moving party's favor, all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. 2505.

*In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir.2010).

Notably, "[a]s a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." *Chuang v. Univ. of Calif. Davis, Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir.2000). The *Chuang* court explained that this minimal evidence standard is due to the nature of employment cases, where " 'the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record.' " *Id.* (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir.1996)).

### III. BACKGROUND FACTS

Pearson was hired by Reynolds in January 2008, to work as a "Lead Swing Custodian" at the School. Previously, Pearson had worked in a custodial position at the Oregon Convention Center, where she received only positive performance reviews. Dkt. # 41, p. 3. At the School, Pearson was the custodian in charge of the "swing shift, or night shift," and in that capacity, she "held some supervisory responsibilities over the other custodians working the same shift." Dkt. # 35, p. 10; *see* Dkt. # 36–3, job description for "Lead Swing Custodian." On June 8, 2009, the School's Assistant Principal John L. Olsen sent a "Letter of Expectation" to Pearson, regarding two occasions when he was unable to contact Pearson on her radio during her shift, and Pearson's failure to respond to a recent e-mail in a timely manner. Olsen advised Pearson:

> Communication is a vital component of your employment with Reynolds School District; particularly as our night lead custodian. Thus it is essential that your supervisors and coworkers be able to communicate with you via email and radio.
>
> * * *
>
> In the future, I will expect you to check your district email every work-day and respond accordingly. I will also expect you to wear a radio during all work hours and respond to calls in a timely manner.

Dkt. # 36–4, p. 1.

In September 2009, Pearson's supervisor Bobby Green was transferred to another school, and Ivan Leigh took over as supervisor at the School. Dkt. # 41, p. 3; Dkt. # 42, ¶ 4. On October 6, 2009, soon after Leigh took over as supervisor, Leigh issued a "Plan of Assistance" to Pearson, citing her for "exhibit[ing] a flagrant lack of sensitivity to the clear expectations as outlined in the classified contract, article 11–Work time[.]" Dkt. # 42–1, p. 1. Leigh stated Pearson had "been observed, and it [had] been documented that on several occasion[s]," Pearson had arrived at work "just at the specified time, or tardy altogether, without having contacting [sic] [her] immediate supervisor." *Id.* Pearson claims that, in fact, she was not late, and she "successfully grieved the disciplinary action through [her] union." Dkt. # 42, ¶ 5.

Pearson alleges that in early 2010, several other incidents occurred involving Leigh, as follows:

> On January 25, 2010, Mr. Leigh called me at the high school after he left for the day about some items he left off of the day's pass-down and during this con-

versation he asked me out of the blue "What is your nationality anyway?" I thought this was strange and I was taken aback because it was unrelated to the conversation we were having.

On March 22, 2010, I was cleaning the kitchen floor and training Adam Bush, another custodian on cleaning the floor when Mr. Leigh came up behind me and yelled that I was not doing it right. James Parvey was taking a break in the break room at the time, which was near by [sic] and Mr. Parvey heard Mr. Leigh yelling at me and came out of the break room and asked what happened. Mr. Leigh started laughing and told Mr. Parvey that I was not cleaning the floor the proper way. They walked away laughing, leaving me feeling humiliated in front of the employee I was trying to train. I know based on my prior custodial experience that I was cleaning the floor the proper way.

On March 25, 2010, during a meeting with Mr. Leigh, he asked me what my goals were with Reynolds School District. I told him that I wanted to be a supervisor or have a management position. Mr. Leigh responded in a discouraging manner that "did you know that here in the U.S. you have to be well educated to be in management, be able to support your boss, speak to the public and be involved in budgeting."

After the March 25, 2010 meeting, Mr. Leigh started assigning additional tasks to me and increasing the demands through the pass-down. My crew was already understaffed and I felt like he was setting me up for failure. Unlike the former supervisor, Mr. Green, Mr. Leigh was not helping with any of the custodial work and instead was adding to my workload every day with the pass-downs and other special requests.

Dkt. # 42, ¶¶ 6–9; *see* Dkt. # 44–1, p. 4; Dkt. # 41, pp. 3–4.

Pearson filed a formal, written complaint against Leigh dated April 14, 2010, alleging "[r]acial discrimination and gender harassment." Dkt. # 44–1, p. 2. In the narrative accompanying her complaint, Pearson stated she was offended by Leigh's comments to her about what is required to be in management "here in the US," feeling he was "implying that [she] was not educated enough, nor able to do the job … like [she] just got imported here in the U.S. after [she had] lived here for almost 30 years and held many other jobs that [were] larger than the high school job." Dkt. # 44–1, p. 3.

Pearson alleges that around the same time, as she was walking away from a meeting with Leigh and Gilbert, she heard Leigh tell Gilbert, " 'what a shame, usually Filipino females would do anything and everything and work hard.' " Dkt. # 41, p. 4 (quoting Dkt. # 42, ¶ 12). Another employee at the School, Gregory Cusick, states Gilbert "pulled [him] aside and told [him], 'Ivan Leigh is a fucking dumbshit: he said that the Filipinos I know—especially the women—are hard workers.' It was clear that this comment was in reference to Marie Pearson." Dkt. # 43, ¶ 2. Cusick "was not surprised to hear that Ivan Leigh had made those comments although [he] did find them offensive." *Id.,* ¶ 3. Cusick asserts Pearson "was a very dedicated worker who was well liked by her crew," and he claims that instead of helping with custodial work as he was supposed to do, Leigh instead "micro-managed the custodial crew and pushed Ms. Pearson in particular to do more and more work and wrote her up for being a minute or two late even though she was staying after her shift every night." *Id.,* ¶¶ 4 & 5.

Pearson's complaint against Leigh was investigated by Reynolds's Assistant Superintendent/Executive Director of Human Resources Chuck Carpenter. On May 4,

2010, Carpenter met with Pearson, Assistant Principal Olsen, OSEA President Cindy Dominiak, and Leigh, to discuss Pearson's complaint. Meeting notes indicate that during the meeting, Leigh apologized to Pearson for the incidents, and Pearson did not request any further action. Dkt. # 36-9, p. 1; *see* Dkt. # 36-10, p. 1. However, Pearson alleges Leigh only "apologized for the kitchen incident, [and] did so insincerely and would not make eye contact, and did not apologize for the other comments." Dkt. # 41, p. 4 (citing Dkt. # 42, ¶ 11). Carpenter held a follow-up meeting with Pearson on May 7, 2010, "to ensure that the matter had been resolved." Dkt. # 36-10, p. 1. Carpenter also met with Gilbert and Leigh to discuss "taking appropriate steps to ensure that there would be no future incidents similar to those [Pearson] complained about." *Id.* Although Reynolds's procedures called for a final written decision to be issued at the conclusion of the investigation, apparently no such report was prepared until nearly a year later, on March 29, 2011, when the school's H.R. Director Jennifer Ellis wrote a letter to Pearson to memorialize what had taken place in response to her complaint. *Id.*

On May 24, 2010, Pearson injured her elbow while working, and her doctor restricted her to light-duty work. Dkt. # 42, ¶ 13. Pearson alleges that between the date of her injury and December 31, 2010, when her doctor released her for full duty, "Leigh repeatedly pressured [her] to work beyond [her] work restrictions, skip [her] rest period after [her] physical therapy appointments and arrange [her] schedule to put in a full eight hours no matter when [her] therapy appointments were scheduled." *Id.*, ¶ 14. She further claims she made a request for vacation in August 2010, which Leigh denied. *Id.*, ¶ 15; Dkt. # 41, p. 5.

On December 22, 2010, Olsen sent Pearson a "Letter of Warning," which Olsen stated was "require[d]" due to three recent "incidents":

1. On November 30, 2010, your district[-]issued radio (labeled with your name) was found and turned in to Ivan Leigh by a member of our teaching staff. Although Mr. Leigh [ ] had directed you, and the rest of the crew to wear their *assigned* radios at all times, you chose to wear another staff member's radio, and failed to report your radio missing.

2. On December 3, 2010 at approximately 9:00pm, I made several unsuccessful attempts to contact a custodian by radio; calling for "Marie," "Adam," and finally, "... any custodian on duty." Since I received no responses, I entered the main build[ing] to search for an evening custodian. I noticed the east N-hall doors were open and I saw a cart in the hallway. When I entered the classroom, I saw you working and called you again with my radio, but received no response. When you saw me, you turned on the radio you were wearing.

3. On December 17, 2010, Mr. Leigh sent you an email expressing concerns about the amount of work the evening crew had been able to accomplish while over-staffed. Your attached response to Mr. Leigh is unacceptable. In addition to making almost no sense, it is filled with grammatical errors, exclamation points, and you used capital letters throughout. In comparing it to the attached correspondence you sent me on June 17, 2010, your email to Mr. Leigh appears hostile and defiant.

Dkt. # 36–12. Olsen directed Pearson to wear her district-issued radio at all times, check her district email daily, "and respond to emails in a professional and coherent manner." *Id.* Pearson claims Leigh and Gilbert "had been plotting this reprimand since at least December 8, 2010," when Leigh emailed Gilbert about Pearson's radio being turned in on November 30, 2010. In the email, Leigh stated to Gilbert, "Marie still hasn't reported her missing radio, it was turned into me 11.30, by a staff member that found it [in] the women's staff restroom. The radio is at my desk." Gilbert responded, "John told me that he advised a course of action. I agree as it may net catching her in a lie. Proceed, but ultimately, this is a written reprimand." Dkt. # 44–1, p. 15. Leigh also indicated, in a December 17, 2010, email to Gilbert, that it was his desire to "move [Pearson] out," due, among other things, to Pearson's "flagrant" email. *Id.*, pp. 18–19.

The December 17, 2010, email exchange referenced in the Letter of Warning was as follows:

[Ivan Leigh to Marie Pearson]
Home Game tomorrow—those assigned to begin at three (3:00) please be prompt.
Further instructions on Fridays pass-down.
Yesterday Tim Seery called and asked if he could use Teresa elsewhere, I said that would be fine, we cannot have a school go without support. Well he didn't leave a message with Teresa explaining his need, so Teresa shows up here.
Anticipating the outage however, I asked Adam to come in 2 hours latter [sic] and Jim to stay late giving you a head start on the night. My concern ... I gave you a solid two-hour head start, and you were fully staffed, yet I struggled to find any indications this

morning that any additional cleaning took place.
The commons was not detailed. Hallways were not detailed (corners). Many toilets and urinals were not detailed. Many flat surfaces are still dusty.
Just to name a few items.
[Pearson's response to Leigh]
OH! ... I AM SORRY ... BUT HOW! ... IS IT END UP TO BE MY FAULTH! [sic], I DON'T HAVE ANY INFORMATION OR KNOW! WHAT YOU HAVE FOR ADAM TO DO. OF WHICH I DON'T HAVE ANY MORE INFORMATION THAN WHAT! YOU'VE SEND U.S. IN THE PASS-DOWN. THAT WAS SEND [sic] TO ALL OF THE RHS. CUSTODIAL ON THE 12/15/10 AND ALSO. LATELY THE CREW AND I FEEL THAT ANY WORK ASSIGNMENT AND OR WORK ORDER ... IT HAS TO COME FROM YOU AND NOT FROM ME.

Dkt. # 36–13.

On January 4, 2011, Pearson was "placed on a plan of assistance as a result of ongoing deficiencies in [her] job performance. Specifically, [Pearson lacked] the communication skills necessary to adequately perform the tasks associated with the position of night lead custodian." Dkt. # 36–14, p. 1. The items outlined in the Plan of Assistance were identical to those raised in the December 22, 2010, Letter of Warning; i.e., using her district-issued radio throughout her work shift, and checking email daily and responding in an appropriate manner. The plan included instructions for writing e-mail responses, such as using "complete sentences, proper grammar and spelling," and following "accepted etiquette guidelines." *Id.* The plan directed Pearson to "[r]efrain from using capital letters and exclamation points, unless [she] want[ed] the reader to feel as though [she was] shouting at

them." *Id.* Pearson was given a period of thirty days "to demonstrate significantly improved job performance as determined through daily observations by Mr. Leigh and Mr. Olsen[,]" with Leigh to provide Pearson with "written weekly progress reports during the duration of the plan." *Id.,* p. 2. The plan provided that at the end of thirty days, Reynolds would take one of three actions: (1) "[d]iscontinue the plan of assistance and recommend continued employment"; (2) "[r]ecommend dismissal"; or (3) "[e]xtend the plan of assistance [,] allowing more time to correct the deficiencies outlined [in the plan]." *Id.*

On January 7, 2011, Pearson submitted a written response to the plan, stating as follows:

> I apologize for the radio[.] I did not realize that my radio was missing. I thought the label was [j]ust got taken off so I used the radio without a label, thinking that it was mine. On another note, whenever the radios make[s] contact with the tables, chairs and doors while working many times throughout the day and they either shut off or change the channel by themselves. This problem has happens [sic] every single day and the crew and I have reported this matter to Ivan Leigh. And also I would like to know where my radio was found because there are time[s] when I come in and my radio is being used by the sub. Person.

> I would like to state the agenda with the e-mail, 12/16/10. I use the caps lock capital letters to make the messages easier for the other party to read. Concerning what I wrote in reply to Mr. Leigh, I placed a question mark to see if I could possibly get some feed-back in what has been going on lately. The crew and I have been told that I "am not their boss" and ["]don't let marie take you for granted" but yet, I am still expected to ensure all of the jobs are done. I am confused with the situation

and would like to get a better directive. I would like to clear the confusion with the crew as well.

Dkt. #44–1, p. 26. Pearson claims she had been using all-caps in her emails "for months without incident," and no one had told her not to do so. She also claims "using email was never in [her] job description for the night lead position," and she had informed Leigh several times that her "computer skills were not proficient," asking if they could communicate in some other manner. Dkt. #42, ¶18. Pearson further claims she was unaware there was *any problem with her communication,* "except that it was difficult to find time to respond to the pass downs given the understaffing and all the other work [she] had to perform." *Id.*

Pursuant to the plan of assistance, Pearson received regular feedback from Leigh regarding her communication skills. Written progress reports indicate Pearson was improving, but some areas of concern remained. *See* Dkt. #44–2, pp. 2–5.

On February 10, 2011, Leigh met with Pearson "to extend the Plan of assistance[.]" Dkt. #44–1, p. 24. Pearson's union representative arrived at the meeting (unexpectedly, from Leigh's point of view), and after discussing the matter with Pearson, announced that because Reynolds was extending the plan of assistance, Pearson felt it necessary to grieve the entire plan. The union representative took the position that the extension amounted to "a new plan without basis." *Id.* Leigh noted the original plan included extension as one possible action at the end of thirty days, and he maintained there was no new plan, "only an extension of the original." *Id.* Leigh scheduled a follow-up meeting between the union representative and Gilbert for February 22, 2011. In a responsive email, Gilbert directed Leigh to "meet with John [Olsen] ASAP tomorrow morning and

strategize. We need to plan before they act." *Id.*

Pearson met with Leigh on March 9, 2011, to discuss her progress under the plan of assistance. Leigh continued to express concern about Pearson's communication with her crew, and Pearson's ongoing attempts to claim "comp time" for completing work that was not finished at the end of her shift. *See* Dkt. # 44–2, pp. 6–7.

Pearson's union representative filed a written grievance regarding the extension of the plan of assistance on March 16, 2011. Dkt. # 36–11, p. 3. The grievance was denied. *Id.*, pp. 1–2; Dkt. # 36–15, p. 1. On March 28, 2011, Reynolds extended Pearson's original plan of assistance for an additional thirty days beginning March 31, 2011. *Id.* The extension notice from Olsen and Leigh indicated Pearson had "demonstrated improved performance by wearing [her] radio consistently, and using email more effectively," but Pearson's "communication skills [were] still not at the level necessary to fulfill the duties of night lead custodian." *Id.* Two new areas of concern were noted on the extension:

- As night lead, you are expected to communicate with staff throughout your shift to ensure that the instructions in the pass-down are addressed. If the work doesn't get done, you have continued to assume that you are expected to stay after your shift to complete the tasks. Mr. Leigh and I have explained on several occasions, that your role is to direct the staff, and inform us when, and why, tasks are not completed—*not to increase the length of your shift in order to finish the work.*

- Although Mr. Leigh and I have explained that *employees may not earn comp. time without prior approval,* you have continued to assume that you can accumulate comp. time if you stay after your shift to complete work that wasn't done by the employees you supervise.

*Id.* (emphasis in original).

In the memo, certain of Pearson's responsibilities were changed to address some of her prior concerns. For example, rather than having pass-downs distributed to all staff, which Pearson had complained undermined her authority, pass-downs would only be sent to Pearson, who then was to review the pass-downs with her crew at the beginning of her shift. Pearson was directed to monitor the custodial staff under her supervision, and rather than staying late to finish other employees' work that was incomplete or unsatisfactory (which Reynolds describes as a failure to delegate responsibilities, "or at least ... to do so in a manner understood by her staff," Dkt. # 35, p. 12), she was directed to report any deficiencies to Leigh. *Id.*, pp. 1–2.

As noted above, on March 29, 2011, the school's H.R. Director Jennifer Ellis wrote a letter to Pearson to memorialize what had taken place in response to Pearson's April 2010 discrimination complaint against Leigh. The same day, Pearson filed a complaint with the Oregon Bureau of Labor and Industries ("BOLI"), alleging "unlawful employment discrimination because of [her] gender and national origin in that [Reynolds had] subjected [her] to a hostile work environment and disciplined [her]." Dkt. # 44–4, p. 3. Pearson also alleged "retaliation for reporting or opposing an unlawful employment practice in that [Reynolds] gave [her] additional discipline." *Id.* In her BOLI complaint, Pearson stated she is female, and her "national origin is the Philippines." *Id.* She alleged as follows:

> [Reynolds's] supervisor Ivan Leigh subjects me to a hostile work environment. This includes but is not limited to: He yells at me and criticizes my work in

front of my crew. He undermines my authority with my crew. He makes statements like: In the U.S. you must be well educated to be in management. He asked me what my nationality was. He says I am weak and my crew takes me for granted.

In/about January 2011, [Reynolds] put me on a corrective plan saying that my English language skills were not good enough, but I speak English very well. I complained to Human Resources that Ivan Leigh was discriminating against me. Human Resources said they did an investigation, but did not find in my favor.

On February 10, 2011, after the investigation, [Reynolds] added more time to my corrective action plan.

*Id.,* pp. 3–4.

On April 6, 2011, Pearson submitted a written response to the extension of her plan of assistance. Pearson complained that Leigh was not communicating clearly with her, and was undermining her authority with the other members of her crew. Dkt. # 44–1, p. 36.

On April 21, 2011, Leigh sent an email to Gilbert to report on a meeting with Pearson regarding her progress. Leigh noted Pearson had improved in some of her communications, but Leigh still felt she was not delegating tasks as necessary, nor was she reporting back to Leigh when crew members failed to complete tasks. In addition, Leigh stated Pearson had started arriving at work a bit late. Leigh indicated Pearson "said she will probably continue to be late daily because she has no one to pick up her daughter after school." Dkt. # 44–1, p. 33. Leigh told Pearson he might have to "update" her 2010 performance review to include "a negative comment about punctuality." *Id.* Gilbert responded, "Nice work ... this is starting to look like termination." *Id.,* p. 32.

Email strings between Leigh, Gilbert, and Olsen, during May and June 2011, suggest there were communication problems and/or misunderstandings with Pearson concerning an injury or illness Pearson suffered in early May 2011. The emails demonstrate a lack of clarity regarding the nature of the illness/injury, and time Pearson requested and took off due to the illness/injury. *See* Dkt. # 44–1, pp. 38–43. In addition, emails between Leigh, Gilbert, Olsen, and Jennifer Ellis of H.R., during October and November 2011, demonstrate that Pearson continued to express concerns regarding various aspects of her job, and her superiors considered various ways in which to respond to those concerns. *See* Dkt. # 44–1, pp. 46–53. Pearson claims these email strings demonstrate that Gilbert, Leigh, and Olsen wanted to get rid of her. Dkt. # 41, pp. 7–8.

Due to Pearson's "[e]xtensive absences incurred during the summer of 2011," and "continued deficiencies" in her job performance, Pearson's plan of assistance was extended repeatedly until it "formally ended on Tuesday, November 22, 2011." Dkt. # 36–16, p. 1. On December 6, 2011, Pearson and her union representative met with Reynolds officials and reached an agreement regarding Pearson's future employment. Reynolds demoted Pearson from the Night Lead Custodian position, and transferred her to "a district wide substitute custodial position," with no reduction in pay. *Id.*

On March 29, 2012, BOLI dismissed Pearson's March 2011 complaint for insufficient evidence, and issued a right-to-sue letter to Pearson. Dkt. # 36–17. Pearson filed the instant case on June 26, 2012.

## IV. DISCUSSION

### A. Title VII Claims

#### 1. Timeliness

The defendants first assert a procedural challenge, arguing Pearson is barred from

alleging disparate treatment or retaliation on the basis of any adverse employment action that allegedly occurred prior to June 2, 2010, or after March 29, 2011, the date of Pearson's BOLI claim. Dkt. # 35, pp. 15–16.

■ "[I]n jurisdictions, such as Oregon, that have joint work-sharing agreements between the EEOC and an equivalent state agency," an employee must file a discrimination claim with either the equivalent state agency (BOLI, in Oregon), or the EEOC, "within 300 days of the alleged unlawful employment practice." *EEOC v. Fred Meyer Stores, Inc.*, 954 F.Supp.2d 1104, 1113 (D.Or.2013) (Haggerty, J) (citing 42 U.S.C. § 2000e–5(e); *Gamez–Morales v. Pacific N.W. Renal Serv., LLC*, 2006 WL 2850476, at *15 (D.Or. Sept. 29, 2006) (Mosman, J)).

With respect to disparate treatment and retaliation claims, the U.S. Supreme Court has observed that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114, 122 S.Ct. 2061, 2073, 153 L.Ed.2d 106 (2002) ("*Morgan*"). Further, only those "discrete acts that 'occurred' within the ... timely filing period are actionable.... All prior discrete discriminatory acts are untimely filed and no longer actionable." *Id.*

■ Pearson filed her BOLI claim on March 29, 2011. Three hundred days prior to her BOLI filing date would be June 2, 2010. Thus, with regard to her claims for disparate treatment and retaliation, no incidents that occurred prior to June 2, 2010, are actionable. *See id.* Even acts "related to acts alleged in timely filed charges" are not actionable. *Id.*, 536 U.S. at 113, 122 S.Ct. at 2072. *But see id.*

(employee may "[use] the prior acts as background evidence in support of a timely claim").

Similarly, Pearson would have had to file a new BOLI claim for any discrete acts that occurred after March 29, 2011. *See Morgan*, 536 U.S. at 113, 122 S.Ct. at 2072 ("Each discrete discriminatory act starts a new clock for filing charges alleging that act."). Pearson has not presented evidence that she filed any BOLI claim other than the one she filed on March 29, 2011. Therefore, no acts of discrimination that occurred after that date are actionable under a disparate treatment/retaliation theory. *Id.*

■ However, hostile work environment claims are treated differently for purposes of calculating the limitations period. Pearson argues that under "the continuing violations doctrine," the court may "consider events that would otherwise be time-barred if the untimely incidents are part of an ongoing unlawful employment practice." Dkt. # 41, p. 9 (citing *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1107 (9th Cir.1998)). Pearson is correct—in the context of a hostile work environment claim.

The *Morgan* Court rejected the Ninth Circuit's "continuing violation" theory with regard to discrete acts of disparate treatment and retaliation, *see Morgan*, 536 U.S. at 110–11, 122 S.Ct. at 2071; but found that "[h]ostile environment claims are different in kind from discrete acts." *Id.*, 536 U.S. at 115, 122 S.Ct. at 2073. The Court noted that the actions causing a hostile work environment sometimes occur over a series of days, or even years, and the discrete acts resulting in a hostile environment may not be actionable on their own, but become actionable based on their cumulative effect. *Id.* Thus, the Court held that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time

period, is permissible for the purposes of assessing liability, *so long as an act contributing to that hostile environment takes place within the statutory time period.*" *Morgan,* 536 U.S. at 105, 122 S.Ct. at 2068 (emphasis added); *see id.,* 536 U.S. at 114, 122 S.Ct. at 2072–73. Accordingly, for Pearson to bring an actionable claim for hostile work environment, she must show that at least one of the "act[s] contributing to that hostile environment" occurred between June 2, 2010, and March 29, 2011. As the chronology summarized above shows, Pearson has made allegations that meet this standard.

### 2. *Disparate Treatment Claim*

#### a. *Standards for disparate treatment claims*

■ "Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (quoting 42 U.S.C. § 2000e–2(a)(1)). "A person suffers disparate treatment in his employment when he or she is singled out and treated less favorably than others similarly situated on account of race [or gender]." *Cornwell v. Electra Central Credit Union,* 439 F.3d 1018, 1028 (9th Cir.2006) (internal quotation marks, citations omitted).

■ A disparate treatment plaintiff may defeat summary judgment by offering direct evidence of discrimination, which the Ninth Circuit has described as "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude. sufficient to permit the *fact finder* to infer that that attitude was more likely than not a moti-

vating factor in the employer's decision." *Enlow v. Salem–Keizer Yellow Cab Co.,* 389 F.3d 802, 812 (9th Cir.2004) (emphasis in original; internal quotation marks, citations omitted).

■ If no direct evidence is available, then the employee may offer circumstantial evidence of discrimination which is evaluated under the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The *Cornwell* court explained this framework as follows:

> To establish a *prima facie* case under Title VII, a plaintiff must offer proof: (1) that the plaintiff belongs to a class of persons protected by Title VII; (2) that the plaintiff performed his or her job satisfactorily; (3) that the plaintiff suffered an adverse employment action; and (4) that the plaintiff's employer treated the plaintiff differently than a similarly situated employee who does not belong to the same protected class as the plaintiff. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, [1824,] 36 L.Ed.2d 668 (1973).

> Establishing a *prima facie* case under *McDonnell Douglas* creates a presumption that the plaintiff's employer undertook the challenged employment action because of the plaintiff's race [or gender]. *See id.* To rebut this presumption, the defendant must produce admissible evidence showing that the defendant undertook the challenged employment action for a "legitimate, nondiscriminatory reason." *Id.* If the defendant does so, then "the presumption of discrimination 'drops out of the picture'" and the plaintiff may defeat summary judgment by satisfying the usual standard of proof required in civil cases under Fed.R.Civ.P. 56(c). *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, [2106,]

147 L.Ed.2d 105 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, [2749,] 125 L.Ed.2d 407 (1993)). In the context of employment discrimination law under Title VII, summary judgment is not appropriate if, based on the evidence in the record, a reasonable jury could conclude by a preponderance of the evidence that the defendant undertook the challenged employment action because of the plaintiff's race [or gender]. *See Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.1994).

*Id.* (footnote omitted).

 Thus, a plaintiff can overcome summary judgment on a disparate treatment claim by offering direct evidence of discriminatory conduct, or by offering circumstantial evidence of disparate treatment and meeting the *McDonnell Douglas* test. *See id.* Alternatively, the plaintiff "may offer evidence 'that the employer's proffered explanation is unworthy of credence' "; in other words, "that the employer's legitimate, nondiscriminatory reason is actually a pretext for racial [or gender] discrimination." *Id.* (additional citations omitted). Evidence of pretext may be circumstantial so long as it is "specific" and "substantial" enough to create a genuine issue of material fact. *Cornwell*, 439 F.3d at 1019 (footnote, citation omitted).

### b. *Pearson's disparate treatment claim*

Pearson argues the *McDonnell Douglas* framework does not come into play because she has offered direct evidence of a discriminatory attitude on the part of her supervisors. Pearson has alleged several discrete incidents that could allow a reasonable factfinder to infer a discriminatory attitude by her supervisors. However, many of those discrete incidents occurred outside the June 2, 2010, to March 29, 2011, time period. In particular, Leigh's question about Pearson's nationality; his alleged comments about Filipino women being "hard working"; and his alleged statement that to be in management, Pearson would need to be well educated; all occurred prior to June 2, 2010. Pearson relies on those untimely statements in claiming she is not required to show she was treated differently from similarly-situated employees because she "has adduced independent evidence of discrimination sufficient to establish a *prima facie* case." Dkt. # 41, p. 14.

Pearson has offered very little evidence of actions within the allowable time period that a reasonable fact-finder could infer amounted to disparate treatment of Pearson. She alleges the following statements constitute direct evidence of discriminatory motive:

(1) When Pearson's union representative, Fernando Gaspasin, appeared for Pearson's meeting with Leigh on February 10, 2011, Leigh noted Gaspasin was "introduced as Fernando," but "quickly made it clear that he has a title, Dr. Fernando." Dkt. # 41, p. 11 (citing Dkt. # 44–1, p. 24).

(2) On March 7, 2011, Gilbert emailed Leigh, asking Leigh to include an item in his "meeting with Fernando Valenzuela (great pitcher)[.]" *Id.* (citing Dkt. # 44–1, p. 28).

(3) On January 25, 2012, Gilbert sent Leigh an application from an individual for Pearson's former position at the School. Leigh responded, "This one has worked in a zoo environment—I guess there is something to be said for working around animals...." *Id.* (citing Dkt. # 44–1, p. 54).

(4) Pearson claims Leigh failed to discipline other janitors who displayed the same conduct as Pearson, and

Leigh gave male janitors positive performance reviews but gave Pearson a negative performance review. *Id.,* p. 13.

Pearson asserts there actually were no other similarly-situated employees with whom she can compare her treatment. However, she argues she "need not show that she was treated differently from other similarly situated employees if 'other circumstances surrounding the adverse employment action give rise to an inference of discrimination.' " *Id.,* p. 14 (quoting *Hawn v. Exec. Jet Mgmt., Inc.,* 615 F.3d 1151, 1156 (9th Cir.2010)).

The court disagrees with Pearson, and finds none of the incidents she alleges took place within the allowable time period constitutes "direct" evidence of disparate treatment, whatever may be said with respect to discriminatory intent. As a result, the court must evaluate Pearson's disparate treatment claim under the *McDonnell Douglas* framework.

■ There can be no dispute that Pearson, as a Filipino female, belongs to a protected class for Title VII purposes. For purposes of this analysis, the court also assumes Pearson's demotion was an adverse employment action. *(But see* the discussion of what constitutes an "adverse employment action" for purposes of a Title VII retaliation claim, below.) Thus, Pearson has met the first and third criteria for a *prima facie* case under Title VII. *See Cornwell,* 439 F.3d at 1028. Viewing the evidence in a light most favorable to Pearson, as the non-moving party, the court finds Pearson also has offered some evidence that she performed her job satisfactorily, meeting the second criterion. *Id.*

However, Pearson has failed to show that Reynolds treated her "differently than a similarly situated employee who does not belong to the same protected class[.]" *Id.* The court therefore finds Pearson has failed to establish a *prima facie* case of

disparate treatment under Title VII. As a result, the burden does not shift to the defendants, and their motion for summary judgment should be granted on Pearson's disparate treatment claim.

### 3. *Retaliation Claim*

#### a. *Standards for retaliation claims*

■ "To make out a prima facie case of retaliation, an employee must show that (1) he [or she] engaged in a protected activity; (2) his [or her] employer subjected him [or her] to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action.' " *Ray v. Henderson,* 217 F.3d 1234, 1240 (9th Cir.2000); *accord Rose v. Plastikon Indus., Inc.,* 537 Fed.Appx. 750, 751 (9th Cir.2013); *see Univ. of Texas S.W. Med. Ctr. v. Nassar,* —— U.S. ——, ——, 133 S.Ct. 2517, 2534, 186 L.Ed.2d 503 (2013) ("a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer"). The causal link "can be inferred from temporal proximity between the protected activity and any adverse employment action or by demonstrating that the person making the employment decision was aware that the plaintiff had engaged in the protected activity." *Devi v. Oregon Dept. of Corrections,* slip op., 2013 WL 3479566, at *7 (D.Or. July 9, 2013) (Aiken, CJ) (citing *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1065 (9th Cir.2002); *Yartzoff v. Thomas,* 809 F.2d 1371, 1376 (9th Cir.1987) (citation omitted)).

■ Making a complaint, formally or informally, to a supervisor about allegedly discriminatory policies or practices constitutes "protected activity" that gives rise to an inference of retaliation. *Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 506 (9th Cir.2000) (citing *Moyo v. Gomez,* 40 F.3d 982 (9th Cir.

1994)); *Jernigan v. Alderwoods Group, Inc.,* 489 F.Supp.2d 1180, 1200 (D.Or.2007) (Marsh, J) (citing *Ray,* 217 F.3d at 1240). If the plaintiff makes out a *prima facie* case of retaliation, then "the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision. . . . If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive." *Ray,* 217 F.3d at 1240 (citing *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1465 (9th Cir.1994)).

#### b. *Pearson's retaliation claim*

Pearson alleges she engaged in a protected activity when, on April 14, 2010, she complained to Reynolds's H.R. department that Leigh "was treating her in a demeaning, hostile and derogatory manner." Dkt. # 5, § 14. The court finds Pearson's April 2010 complaint was a protected activity, establishing the first criterion of a *prima facie* case of retaliation. *See Ray,* 217 F.3d at 1240.

As discussed above, Pearson may only seek relief with regard to adverse employment actions that occurred between June 2, 2010, and March 29, 2011. *See Morgan,* 536 U.S. at 114, 122 S.Ct. at 2073. In her First Amended Complaint, Pearson alleges the following adverse employment actions during that time frame:

(1) Between April 14, 2010, and December 6, 2011, Leigh sent Pearson "numerous emails, sometimes several per day, adding to Ms. Pearson's workload in retaliation for [her] HR complaint." Dkt. # 5, ¶ 16.

(2) From the date of Pearson's work-related injury on May 24, 2010, through December 31, 2010, Leigh "repeatedly pressured Ms. Pearson to work beyond her restrictions, causing her setbacks in her recov-

ery, additional pain and extreme discomfort." *Id.,* ¶ 18.

(3) Leigh issued a written warning to Pearson on July 24, 2010, "for allegedly reporting to work several minutes past her designated shift times." *Id.,* ¶ 19.

(4) On December 22, 2010, Olsen issued the "Letter of Warning" to Pearson regarding use of her radio and her email activities, allegedly "based on complaints from Mr. Leigh." *Id.,* ¶ 20; *see* Dkt. # 36–12.

(5) On January 4, 2011, Reynolds issued the plan of assistance regarding Pearson's communication skills. The plan of assistance was still in place at the time Pearson filed her BOLI complaint. *Id.,* ¶ 21; *see* Dkt. # 36–14

■ An "adverse employment action" for purposes of a Title VII retaliation claim includes " 'any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity.' " *Ray,* 217 F.3d at 1242–43 (quoting EEOC Compliance Manual Section 8, "Retaliation," 8008 (1998)). The *Ray* court noted the "EEOC test covers lateral transfers, unfavorable job references, and changes in work schedules." *Id.,* 217 F.3d at 1243.

In *Burlington Northern and Santa Fe Railway Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), the Supreme Court discussed at some length the type of harm that must result from an employment action in order for it to be deemed an "adverse action." Agreeing with the views of the Seventh Circuit and the District of Columbia Circuit, the *White* Court held, "In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it

well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White,* 548 U.S. at 68, 126 S.Ct. at 2415 (internal quotation marks, citations omitted). This type of "material adversity" does not include, for example, "petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* (citation omitted). The Court explained that the "reasonable employee" standard is an objective one that "is judicially administrable," avoiding "the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id.,* 548 U.S. at 68–69, 126 S.Ct. at 2415. Significantly, under this standard, the court does not consider the allegedly discriminatory act that led the plaintiff to file a complaint. "Rather, the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint." *Id.,* 548 U.S. at 69, 126 S.Ct. at 2416. The Court explained, "By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, we believe this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." *Id.,* 548 U.S. at 69–70, 126 S.Ct. at 2416.

▪ Applying this standard to Pearson's claims, the court finds Pearson has offered sufficient evidence to show both that the employment actions to which she was subjected during the allowable period were "adverse," and therefore actionable; and that "but for" her discrimination complaint against Leigh, one or more of those actions would not have been taken against her. The court finds it significant that the discrimination complaint was made only against Leigh, and it was Leigh who initiated or influenced all of the adverse employment actions against Pearson. Nu-

merous courts have held that, for example, in the context of a discriminatory failure to hire or promote, the discriminatory animus of one who influences or participates in the adverse decision could allow a reasonable fact-finder to conclude the animus affected the decision. *See, e.g., Dominguez–Curry v. Nevada Transp. Dept.,* 424 F.3d 1027, 1039–40 & n. 5 (9th Cir.2005) (citing cases); *see also Morgan,* 536 U.S. at 113, 122 S.Ct. at 2072 (employee may "[use] the prior acts as background evidence in support of a timely claim"). Moreover, the existence of a hostile work environment, itself, may be cognizable under Title VII's anti-retaliation provisions. *Ray,* 217 F.3d at 1244–45. For purposes of summary judgment, the court concludes that a reasonable person in Pearson's position could be dissuaded from making a discrimination complaint for fear of the types of actions taken against Pearson. Thus, the court finds Pearson has made out a *prima facie* case of retaliation.

▪ Like the standard for evaluating a disparate treatment claim, once a plaintiff has made out a *prima facie* case of retaliation, "the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Devi,* 2013 WL 3479566 at *3 (citing, *inter alia, Cornwell,* 439 F.3d at 1028; *Manatt v. Bank of Am., N.A.,* 339 F.3d 792, 800 (9th Cir.2003)). Reynolds argues its "legitimate, non-discriminatory reasons for the two warning letters, and the plan of improvement, are contained within the documents themselves." Dkt. # 35, p. 22. Reynolds asserts the first warning was issued because Pearson was late; the second warning was issued because of Pearson's communication difficulties, specifically with regard to her radio and her emails; and the plan of assistance was "because her communication skills were below the

standards expected of a lead custodian." *Id.* Reynolds's explanation rebuts the presumption that its actions were retaliatory. *See Cornwell,* 439 F.3d at 1028 (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824).

The burden shifts back to Pearson to show the reasons offered by Reynolds for its actions were pretextual. *See Devi,* 2013 WL 3479566, at *4. As noted above, Pearson may offer circumstantial evidence so long as it is "specific" and "substantial" enough to create a genuine issue of material fact for trial. *Cornwell,* 439 F.3d at 1019 (footnote, citation omitted). However, as Judge Aiken observed in *Devi,* though summary judgment may be appropriate " 'when evidence of discriminatory intent is *totally* lacking, [it] is generally unsuitable in Title VII cases in which the plaintiff has established a *prima facie* case because of the elusive factual question of intentional discrimination.' " *Devi,* 2013 WL 3479566, at *4 (emphasis added; quoting *Yartzoff v. Thomas,* 809 F.2d 1371, 1377 (9th Cir.1987)).

The court finds Pearson has offered evidence from which a fact-finder could conclude that Reynolds's employment actions during the relevant period were retaliatory, and Reynolds's proffered explanation for its actions was pretextual. As such, the defendants' motion for summary judgment should be denied as to Pearson's retaliation claim, as it pertains to retaliation for her April 2010 discrimination complaint.

■ However, further discussion is warranted regarding Pearson's assertion, in her brief, that adverse employment actions in retaliation for her BOLI complaint are actionable. *See* Dkt. # 41, pp. 15–17. Pearson never filed a subsequent BOLI complaint, to allege that she had been subjected to adverse employment action as a result of her first BOLI complaint. Therefore, any such claim is unexhausted and cannot form a basis for relief in this action. *See Morgan,* 536 U.S. at 113, 122 S.Ct. at 2072; *see also Richter v. Advance Auto Parts, Inc.,* 686 F.3d 847, 851–52 (8th Cir.2012) (holding retaliation claim based on EEOC charge must, itself, be exhausted).

### 4. Hostile Work Environment Claim

■ "Title VII prohibits the creation of a hostile work environment.... [T]he plaintiff must show that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered." *Vance v. Ball State Univ.,* —— U.S. ——, ——, 133 S.Ct. 2434, 2441, 186 L.Ed.2d 565 (2013) (citations omitted). Actionable conduct must be severe or pervasive enough that a reasonable person would find it hostile or abusive. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). There is also a subjective component to the test, in that "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Id.,* 510 U.S. at 21–22, 114 S.Ct. at 370.

■ The Ninth Circuit has explained the criteria for a hostile work environment claim, as follows:

> To establish a *prima facie* case for a hostile-work environment claim, [the plaintiff] must raise a triable issue of fact as to whether (1) the defendants subjected her to verbal or physical conduct based on her race [or gender]; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

*Surrell v. Calif. Water Serv. Co.,* 518 F.3d 1097, 1108 (9th Cir.2008) (citing *Manatt,*

339 F.3d at 798). For purposes of summary judgment, the court finds Pearson has established the first two criteria. The primary issue before the court is whether Pearson has shown the alleged conduct "was sufficiently severe or pervasive."

The determination of "whether an environment is 'hostile' or 'abusive' can only be determined by looking at all the circumstances." *Best v. California Dept. of Corrections*, 21 Fed.Appx. 553, 556 (9th Cir.2001). The *Best* court explained further:

> "These [circumstances] may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris* [*v. Forklift Sys., Inc.*], 510 U.S. [17,] 23[, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993)]. Simple teasing, offhand comments, and isolated incidents (unless extremely serious) do not amount to discriminatory changes in the terms and conditions of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, [2283,] 141 L.Ed.2d 662 (1998); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir.1994). *Faragher* emphasized that "conduct must be extreme to amount to a change in the terms and conditions of employment." 524 U.S. at 788[, 118 S.Ct. at 2283]. Furthermore, [in the context of a gender discrimination claim,] it is clear that though harassing conduct or language need not be sexual in nature in order to state a hostile work environment claim under title VII, the harassment must be based on the victim's gender. *See Hocevar v. Purdue Frederick Co.*, 223 F.3d 721, 737 (8th Cir.2000); *cf. Ellison* [*v. Brady*], 924 F.2d [872] at 875 n. 4 [ (9th Cir. 1991) ].

*Id.* Stated in simpler terms, although an isolated comment, even if offensive, is insufficient to create actionable harassment, "it is sufficient to show that the conduct 'pollute[d] the [plaintiff's] workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position.'" *Mousleh v. Gladstone Auto, LLC*, 2012 WL 2574812, at *6 (D.Or. July 3, 2012) (Hernandez, J) (*quoting McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 (9th Cir.2004) (internal quotation marks, citations omitted)).

Taking the facts in the light most favorable to Pearson, the court finds she has shown her supervisors' conduct was sufficiently pervasive to create a question of fact for the jury under these standards. As such, the defendants' motion for summary judgment on Pearson's hostile work environment claim should be denied.

### B. Tort Claims

#### 1. Timeliness

The defendants argue Pearson's tort claims are untimely under the Oregon Tort Claims Act ("OTCA"), ORS §§ 30.260–30.300. Dkt. #35, pp. 36–37. The OTCA provides that "[t]he sole cause of action for a tort committed by officers, employees or agents of a public body acting within the scope of their employment or duties ... is an action under ORS 30.260 to 30.300." ORS § 30.265(2). "A school district is a public body." *Jack Doe 1 v. Lake Oswego Sch. Dist.*, 242 Or.App. 605, 612, 259 P.3d 27, 32 (2011), *rev'd on other grounds*, 353 Or. 321, 297 P.3d 1287 (2013).

In order to bring a claim against a school district, such as Reynolds, under the OTCA, a person first must give notice as required by the OTCA. For the types of claims Pearson asserts here, notice must be given "within 180 days after the alleged

loss or injury." ORS § 30.275(2)(b). Pearson alleges she gave Reynolds notice of her tort claim "[o]n or about June 21, 2012." Dkt. # 5, ¶ 28. One hundred eighty days prior to June 21, 2012, is December 24, 2011. The defendants argue any of Pearson's claims that accrued prior to that date are barred for failure to provide timely notice under the OTCA. Dkt. # 35, p. 36.

In addition, an action against a public body under the OTCA must "be commenced within two years after the alleged loss or injury." ORS § 30.275(9). Pearson commenced this action on June 26, 2012. Thus, the defendants argue, Pearson is barred from asserting any tort claims that accrued before June 26, 2010. Dkt. # 35, pp. 36–37.

Pearson argues, without elaboration, that Oregon's "continuing harm doctrine" makes all of her tort claims timely. Dkt. # 41, p. 24.

■ "The continuing tort doctrine applies to repeated instances or continuing acts of the same nature where there is no discrete act or incident that can be fairly determined to have caused the alleged harm." *McLean v. Shelton,* slip op., 2013 WL 3994760, at *6 (D.Or. Aug. 2, 2013) (Hernandez, J) (citing, *inter alia, Flowers v. Carville,* 310 F.3d 1118, 1126 (9th Cir. 2002)).

Oregon courts have distinguished between a continuing course of conduct that involves discrete acts, each of which would be actionable separately, and a series of acts constituting a "continuing tort." The court in *Boardmaster Corp. v. Jackson County,* 224 Or.App. 533, 198 P.3d 454 (2008), discussed this distinction in some detail, examining two Oregon cases that highlight the distinction. In *Davis v. Bostick,* 282 Or. 667, 580 P.2d 544 (1978), the Oregon Supreme Court explained the "continuing tort" doctrine in the context of a tort claim based on an alleged course of

conduct by the plaintiff's husband over the course of several years. The plaintiff alleged a course of conduct consisting of ten incidents, beginning in 1973. She filed her lawsuit in August 1976, alleging these incidents were "designed to inflict emotional stress and mental anguish." *Boardmaster,* 224 Or.App. at 549–50, 198 P.3d at 463 (citing *Davis,* 282 Or. at 669–70, 580 P.2d at 546). The defendant in *Davis* argued four of the alleged incidents, occurring in 1973 and 1974, were barred by the two-year statute of limitations. "The trial court struck that defense on the ground that the plaintiff's pleading sufficiently alleged a 'continuing tort' that consisted of all 10 instances, and the jury returned a verdict for the plaintiff." *Boardmaster,* 224 Or.App. at 550, 198 P.3d at 463 (citing *Davis,* 282 Or. at 669, 671, 580 P.2d at 546).

On appeal, the Oregon Supreme Court reversed, concluding "each act alleged was 'separately actionable' because each 'caused harm.' … [U]nlike a continuing tort situation, where 'the harm complained of … [reaches] the level of actionability only at the end of the series of actions, the defendant's conduct in *Davis* 'repeatedly reached the level of actionability.'" *Id.* (quoting *Davis,* 282 Or. at 672, 580 P.2d at 547). The *Davis* court explained that " 'a cause of action does not reaccrue every time another distress is inflicted,'" and one should not be able to designate " 'a series of discrete acts, even if connected in design or intent,'" as a "continuing tort" that would allow the statute of limitations to be avoided. *Id.,* 224 Or.App. at 550, 198 P.3d at 463–64 (quoting *Davis,* 282 Or. at 674, 580 P.2d at 548).

The *Boardmaster* court contrasted *Davis* with the holding in *Griffin v. Tri–Met,* 112 Or.App. 575, 831 P.2d 42 (1992), *aff'd in part and rev'd in part on other grounds,* 318 Or. 500, 870 P.2d 808 (1994),

a case the *Boardmaster* court described as "involv[ing] a paradigmatic continuing tort." *Boardmaster*, 224 Or.App. at 550–51, 198 P.3d at 464. The court's discussion is instructive in the present case:

> [In *Griffin* ], the plaintiff, a Tri–Met dispatcher, asserted a claim for unlawful HIV-based discrimination against Tri–Met. The complaint alleged a course of conduct, including events that occurred more than 180 days before the plaintiff gave Tri–Met notice of claim, as prescribed in [the OTCA]. Tri–Met successfully moved to strike allegations in the complaint pertaining to those events, arguing that any recovery based on that conduct was time barred. However, the trial court denied Tri–Met's motion to exclude evidence of those events. The jury returned a verdict for the plaintiff.
>
> On appeal, Tri–Met assigned error to the trial court's denial of its motion to exclude evidence of conduct occurring more than 180 days before the tort claim notice was given, and the plaintiff cross-assigned error to the court's order striking the allegations pertaining to that conduct. Specifically, the plaintiff contended that those allegations should not have been stricken "because they were part of a continuing tort." We agreed with the plaintiff with respect to the cross-assignment, and, in so holding, distinguished *Davis:*
>
> "In *Davis*, the defendant's physical and mental abuse of the plaintiff were continuous in the sense that, all together, the abuse was a course of conduct. However, the court held that, because the defendant's acts were discrete and egregious in nature, each abusive act was separately actionable and not merely an element of a single tort. Here, the October and November, 1987 acts, although separate incidents, are not the type of discrete, permanent events that would likely support separate actions for wrongful discrimination. Instead, they can be reasonably construed as elements of a systematic pattern of conduct, aimed at causing plaintiff's eventual termination. The allegations should not have been stricken."
>
> *Griffin*, 112 Or.App. at 581–82, 831 P.2d [at 45–46].

*Boardmaster*, 224 Or.App. at 551, 198 P.3d at 464 (internal citations to *Griffin* omitted).

The court finds Pearson's allegations in the present case are similar to the *Griffin* plaintiff's allegations, in that "they can be reasonably construed as elements of a systematic pattern of conduct, aimed at causing [Pearson's] eventual termination." *Id.* As such, the defendants' argument that Pearson's claims are time-barred under the OTCA's notice provisions and statute of limitations should be rejected. However, merely because Pearson's claims are timely under the OTCA does not mean her tort claims against Reynolds are cognizable.

### 2. Intentional Infliction of Emotional Distress ("IIED")

In *Mayorga v. Costco Wholesale Corp.*, the Ninth Circuit Court of Appeals, applying Oregon law, observed:

> To succeed on a claim for intentional infliction of emotional distress, a plaintiff must prove: "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *McGanty v. Staudenraus*, 321 Or. 532, 901 P.2d 841, 849 (1995) (internal quotation marks and citation omitted).

*Mayorga*, 302 Fed.Appx. 748, 749 (9th Cir. 2008); *accord Grimmett v. Knife River*

*Corp.-Northwest,* No. CV–10–241, slip op., 2011 WL 841149 (D.Or. Mar. 8, 2011) (Hubel, MJ); *see House v. Hicks,* 218 Or.App. 348, 357–58, 179 P.3d 730, 736 (2008) (IIED plaintiff must prove that defendant "intended to cause plaintiff severe emotional distress or knew with substantial certainty that their conduct would cause such distress"; that defendant's conduct was "outrageous … i.e., conduct extraordinarily beyond the bounds of socially tolerable behavior"; and that defendant's "conduct in fact caused plaintiff severe emotional distress") (citation omitted)

Pearson "concedes that she is unable to adduce evidence sufficient to establish a *prima facie* claim for emotional distress." Dkt. # 41, p. 24. As such, the defendants' motion for summary judgment on this claim should be granted.

### 3. *Negligent supervision*

In general, "[t]o prevail on a claim for negligent supervision, a plaintiff must establish that the employer knew or should have known there was a foreseeable risk that [an] employee would engage in discrimination or harassment in the workplace." *Hayes v. Erickson Air–Crane Co.,* slip op., 2013 WL 3146831, at \*5 (D.Or. June 18, 2013) (Panner, J) (citing *Wilberger v. Creative Bldg. Main., Inc.,* 2009 WL 1773342 (D.Or. June 22, 2009) (Aiken, CJ)); *see Marquez v. Harper Sch. Dist. No. 66,* 2011 WL 2462035, at \*19 (D.Or. Mar. 24, 2011) (Sullivan, MJ) ("The key issue in a claim for negligent supervision is whether, in light of what the employer knew or should have known about the employee, the employer could reasonably foresee that the employee, if inadequately supervised, would engage in the kind of conduct that ultimately harmed the plaintiff."). The question of foreseeability is generally an issue of fact that cannot be decided on summary judgment.

However, although the *Hayes* and *Marquez* decisions appear to recognize that, under appropriate circumstances, a claim for negligent supervision could be brought, neither of those courts was asked to determine the interplay between a negligent supervision claim and Oregon's workers' compensation statutory scheme. The question here is whether a tort remedy— any tort remedy—is available to redress Pearson's alleged injuries. Pearson "concedes that the proper remedy for the *physical injuries* she suffered at work while performing work-related tasks [is] through the worker's compensation system." Dkt. # 41, p. 25 (emphasis added). However, she argues she "has alleged other injuries which are not compensable through the worker's compensation system such as the humiliation and emotional distress she suffered as a result of … Leigh's unmitigated hostile treatment toward her." *Id.* Thus, Pearson has made it clear that her negligent supervision claim seeks damages solely for mental and emotional injuries. *Id.*

The defendants argue Pearson cannot recover in tort for her alleged injuries because: (1) Oregon prohibits claims for negligent infliction of emotional distress without some physical injury or impact; (2) Pearson's exclusive remedy is through Oregon's workers' compensation system; and (3) pursuant to the OTCA, Reynolds is statutorily immune from tort liability for Pearson's alleged injuries. Dkt. # 35, pp. 40–43 (citing, *inter alia,* ORS § 30.265(6)). Because the court finds arguments (1) and (2) carry the day, the court does not address the issue of statutory immunity.

The Oregon Court of Appeals explained the underlying premise of the workers' compensation system in *Stone v. Finnerty,* 182 Or.App. 452, 50 P.3d 1179 (2002), as follows:

The workers' compensation statutory scheme operates as a substitute for civil *claims* that an employee could assert against his or her employer in an action at common law and provides liability "coverage" against the risks that arise from those kinds of claims. *Hale v. Port of Portland,* 308 Or. 508, 521, 783 P.2d 506[, 513] (1989) ("[T]he Oregon Legislature ... eliminated the haphazard system of liability of employers to some employees for some injuries occurring under a limited number of circumstances, and replaced it with a system that made employers liable for the medical expenses of their injured workers without regard to fault."); *Errand v. Cascade Steel Rolling Mills, Inc.,* 320 Or. 509, 514, 888 P.2d 544[, 546] (1995) (explaining that the workers' compensation system replaced the civil remedy system with a *quid pro quo* that gives workers a remedy without proving fault, in exchange for the exclusivity of that remedy). The workers' compensation law defines "compensability" in terms of the work-related injuries, disease, disabilities, conditions, and/or death for which an employee or his or her representatives can recover.

*Stone,* 182 Or.App. at 458–59, 50 P.3d at 1185 (emphasis in original); *see also Stone,* 182 Or.App. at 459, 50 P.3d at 1185 (alluding, in *dicta,* to the fact that both physical and mental injuries are compensable under workers' compensation law).

The Oregon courts have grappled with the interplay between the workers' compensation statutory scheme and common-law tort claims in a variety of contexts. In *Smothers v. Gresham Transfer, Inc.,* 332 Or. 83, 23 P.3d 333 (2001), the court observed that due to recent changes in the law, "workers' compensation law does not provide compensation for a work-related incident that was only a contributing cause [as opposed to the major contributing cause,] of the worker[ ]'s injury. There-

fore, workers' compensation law no longer provides a remedy for some wrongs or harms occurring in the workplace for which a common-law negligence cause of action had existed when the drafters wrote the Oregon Constitution in 1857." *Smothers,* 332 Or. at 133–34, 23 P.3d at 361. The *Smothers* court conducted an extensive analysis of the "remedy clause" of Article 1, section 10, of the Oregon Constitution, and concluded that in some cases, application of the "exclusive remedy" provision of the workers' compensation law is unconstitutional. *Smothers,* 332 Or. at 135, 23 P.3d at 362; *see Smothers, passim.*

The crux of the *Smothers* holding is that if an alleged work-place injury would have been cognizable in a common-law negligence action in 1857, when the Oregon Constitution was drafted, but that same injury would not be compensable under current workers' compensation law, then the workers' compensation scheme's "exclusive remedy" provision is unconstitutional as to that claim, and the plaintiff may maintain a negligence action against the employer. *Id.,* 332 Or. at 134, 23 P.3d at 362 ("Having alleged an injury of the kind that the remedy clause protects, and having demonstrated that there was no remedial process available under present workers' compensation laws, plaintiff should have been allowed to proceed with his negligence action."); *see id.,* 332 Or. at 134, 136, 23 P.3d at 361–62 & 362–63 (noting that "under ORS 656.018 (1995), workers' compensation law purports to be the exclusive remedy for work-related injuries, whether or not a claim is compensable"); *see also Stone,* 182 Or.App. at 459–60, 50 P.3d at 1185–86 (holding Oregon workers' compensation statutory system "provides no 'coverage' for the risk of claims like [a] false imprisonment claim, ... even though defendants' conduct may also have caused compensable physical or mental injuries,"

and OTCA immunity only insulates public bodies from "civil claims that the legislature intended to replace with a workers' compensation remedy.").

Thus, the court must determine, first, whether Pearson's alleged injuries would have been cognizable in a common-law negligence action in 1857; i.e., whether her alleged injuries are "of the kind that the remedy clause protects." *Smothers*, 332 Or. at 134, 23 P.3d at 362. If a common-law remedy for this type of claim would have been available in 1857, but the same injury would not be compensable under the current workers' compensation scheme, then under *Smothers*, the exclusive remedy provision of ORS § 656.018 is unconstitutional as to that claim, and Pearson's negligence claim is evaluated under general tort standards. However, if no common-law remedy existed for this type of claim in 1857, then the exclusive remedy provision does apply, and Pearson's claim is barred.

Early Oregon jurisprudence suggests that "one suffering from injuries to his person, due to the negligence of another, [could] recover for mental distress and anguish *resulting from the same cause.*" *Maynard v. Oregon R. & Nav. Co.*, 46 Or. 15, 18, 78 P. 983, 984 (1904) (emphasis added); overruled in certain specific factual contexts by *Fehely v. Senders*, 170 Or. 457, 135 P.2d 283 (1943). However, it was generally recognized that mental anguish unrelated to a physical injury could not provide an independent basis for recovery. *See id.*, 46 Or. at 18–19, 78 P. at 984–85 (discussing cases).

As noted above, Pearson "concedes that the proper remedy for the *physical injuries* she suffered at work while performing work-related tasks are through the worker's compensation system." Dkt. # 41, p. 25 (emphasis added). Such injuries would include Pearson's alleged "physical harm [that occurred] as a result of defendants'

negligence when Leigh worked her beyond her physical restrictions after suffering a workplace injury and as a result of understaffing and over-assignment of job duties." *Id.*

■ However, Pearson claims she suffered "other injuries which are not compensable through the worker's compensation system ... such as the humiliation and emotional distress she suffered as a result of ... Leigh's unmitigated hostile treatment towards her." *Id.*, pp. 25–26. The court finds such a claim would not have been cognizable in a common-law negligence claim in 1857. As a result, the exclusive remedy provision of the workers' compensation scheme applies to her claim, and Pearson's exclusive remedy is through the workers' compensation system.

■ Even if the exclusive remedy provision were not applicable, Pearson's claim would still fail. Pearson's claim for mental/emotional damages as a result of Reynolds's negligent failure to supervise Leigh is equivalent to a claim for negligent infliction of emotional distress. Except in limited circumstances not present here, Oregon law continues to require " 'an act or omission that results in some perceptible physical effect on a plaintiff ... to warrant recovery of emotional distress damages.' " *Simons v. Beard*, 188 Or.App. 370, 376, 72 P.3d 96, 100 (2003) (quoting *Chouinard v. Health Ventures*, 179 Or.App. 507, 515, 39 P.3d 951, 955 (2002) (footnote omitted)). Because Pearson's "humiliation and emotional distress ... as a result of ... Leigh's unmitigated hostile treatment toward her," Dkt. # 41, p. 25, is wholly divorced from any physical injury, Pearson cannot maintain a negligence action against Reynolds for the "humiliation and emotional distress" she claims. As a result, the defendant's motion for summary judgment should be granted as to Pearson's negligent supervision claim.

### C. Punitive Damages

The defendants argue punitive damages are not available for any of Pearson's claims. Dkt. # 35, pp. 43–44. Pearson concedes this point. Dkt. # 41, p. 26. Accordingly, the defendants' motion for summary judgment on Pearson's claim for punitive damages should be granted, and the punitive damages claim should be stricken.

### V. CONCLUSION

In summary, the undersigned recommends the defendants' motion for summary judgment be granted in part and denied in part, as follows:

1) granted as to all claims against the individual defendants Ivan L. Leigh and Jeff Gilbert, dismissing them from the case as improper parties;

2) granted as to Pearson's disparate treatment claim;

3) denied as to Pearson's retaliation claim as it pertains to alleged retaliation for her April 2010 discrimination complaint, but granted as it pertains to alleged retaliation for her BOLI complaint;

4) denied as to Pearson's hostile work environment claim;

5) denied on grounds that her tort claims are untimely; but

6) granted as to Pearson's claim for intentional infliction of emotional distress;

7) granted as to Pearson's claim for negligent supervision; and

8) granted as to Pearson's claim for punitive damages.*

### SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge. Objections, if any, are due by **December 6, 2013.**

---

* Thus, the claims that would remain in the case are Pearson's retaliation claim as it pertains to alleged retaliation for her April 2010 dis-

If no objections are filed, then the Findings and Recommendations will go under advisement on that date. If objections are filed, then any response is due by **December 23, 2013.** By the earlier of the response due date or the date a response is filed, the Findings and Recommendations will go under advisement.

IT IS SO ORDERED.

Nov. 18, 2013.

crimination complaint, and Pearson's hostile work environment claim.